Paulette ROSS, et al., Plaintiffs,

v.

Donald W. SALTMARSH, et al., Defendants.

No. 74 Civ. 5047.

United States District Court,
S. D. New York.

Aug. 25, 1981.

Children's Defense Fund, Washington, D. C., Mid-Hudson Valley Legal Services, Inc., Newburgh, N. Y., for plaintiffs.

Demov, Morris, Levin & Shein, New York City, for defendants.

## MEMORANDUM OPINION and ORDER

LOWE, District Judge.

This Court, pursuant to Fed.R.Civ.P. 23(e), approved a proposed settlement of all claims concerning the merits of this civil rights class action, *Ross v. Saltmarsh*, 500 F.Supp. 935 (S.D.N.Y.1980). Plaintiffs' application for an award of attorneys' fees, which defendants oppose, was referred to Magistrate Raby[1] for an evidentiary hearing to consider the extent and nature of the legal services rendered by plaintiffs' counsel and to report on the amount of fees and costs to be awarded plaintiffs' counsel for those services.[2]

---

1. *See* 28 U.S.C. § 636(b)(1).

2. *See Ross v. Saltmarsh, supra* at 948 & n.16. This Court previously ruled that plaintiffs are entitled to an award of interim attorneys' fees

### I. *Magistrate's Findings*

Based on the evidence and testimony received at the evidentiary hearing, Magistrate Raby made the following findings and recommendations:

1. Plaintiffs are a "prevailing party" within the meaning of 42 U.S.C. § 1988, the civil rights attorneys' fees statute.[3]

2. The lodestar amount[4] of plaintiffs' fee award should be adjusted to reflect: (a) a lower hourly rate for members of plaintiffs counsel who were not yet admitted to the bar; (b) a lower rate of reimbursable compensation for attorney Richard Sobol; (c) a penalty of a ten percent (10%) reduction from the total charges for those members of plaintiffs' counsel who totally reconstructed their time records, and a five percent (5%) reduction for those members who partially reconstructed their records;

3. Plaintiffs' counsel did not engage in any duplicative representation that would warrant a reduction in the compensable time charged.

4. The compensable travel time of plaintiffs' counsel should be reduced.[5]

5. No reduction should be made for the few ascertainable instances of time charges that were administrative or clerical in nature.

6. The total amount of time charges sought by plaintiffs' counsel for litigating the attorneys' fee claim should be awarded.

7. The request of plaintiffs' counsel for costs and expenses, *i. e.,* disbursements and time charges for paralegals and law students, should be awarded. However, reimbursement for the services rendered plaintiffs' counsel by two data analysts should be denied.

8. An increment to the lodestar, or bonus, should not be awarded.

9. In sum, plaintiffs' petition for attorneys' fees and costs should be granted in the amount of $227,727.45.

Both parties have filed objections to the Magistrate's findings and recommendations.[6]

---

for securing a preliminary injunction in this action and successfully defending it on appeal. Id. at 946. In the Court's Order of Reference, Magistrate Raby was directed to consider the nature and extent of the legal services rendered by plaintiffs' counsel in connection with both the preliminary injunction and the class action settlement.

**3.** 42 U.S.C. § 1988 provides, in relevant part,

In any action or proceeding to enforce a provision of sections 1981, 1982, 1983, 1985 and 1986 of this title, title IX of Public Law 92–318, or in any civil action or proceeding, by or on behalf of the United States of America, to enforce, or charging a violation of, a provision of the United States Internal Revenue Code, or title VI of the Civil Rights Act of 1964, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the case. [citations omitted].

**4.** This Circuit has established a two-step procedure to be followed in the calculation of such [attorneys' fee] awards. First, the court in the calculation should establish a 'lodestar' figure, obtained 'by multiplying the number of hours expended by each attorney involved in each type of work on the case by the hourly rate normally charged for similar work by attorneys of like skill in the area.'

*City of Detroit v. Grinnell Corp.* ('*Grinnell II*'), 560 F.2d 1093, 1098 (2d Cir. 1977). *See also City of Detroit v. Grinnell Corp.,* ('*Grinnell I*'), 495 F.2d 448 (2d Cir. 1974). Next, the court may adjust the lodestar figure upward or downward to take account of such subjective factors as the risk and complexity of the litigation and the quality of the representation. Under these procedures, a different rate of compensation may well be set for different types of litigation tasks, and an attorney whose rates are higher than those prevailing in the community may well receive less than his own usual charges.

*Cohen v. West Haven Board of Police Commissioners,* 638 F.2d 496, 505 (2d Cir. 1980).

**5.** Defendants do not object to the Magistrate's recommendations on the reimbursement of plaintiffs' counsels' travel time. However, defendants have pointed out erroneous arithmetic calculations in the report concerning this issue. The Court has corrected these errors (see pp. 772–773, *infra*).

**6.** Under 28 U.S.C. § 636(b)(1), the Court is required to make a de novo determination of those portions of the Magistrate's report or specified proposed findings or recommendations to which objection is made.

## II. Defendants' Objections

### A. Prevailing Party

■ Defendants' first objection is that the terms and conditions of the Court approved Consent Decree bar a determination that plaintiffs are the prevailing party in this action. Specifically, defendants refer to certain language in the Decree which provides that defendants' agreement to the settlement does not constitute a waiver of either plaintiffs' claim for attorneys' fees or any defense defendants may have against that claim.[7]

■ Although defendants have expressly reserved the right to object to plaintiffs' fee application, the language in the Consent Decree does not affect the Court's determination that plaintiffs are the prevailing party within the meaning of § 1988. In *Maher v. Gagne*, 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), the United States Supreme Court set forth the following standard—" 'for purposes of the award of counsel fees, parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief.' " *Id.* at 129, 100 S.Ct. at 2575 (quoting S.Rep.No. 94–1011, p.5 (1976), U.S.Code Cong. & Admin. News, 5908, 5912. As a result of this litigation plaintiffs obtained preliminary injunctive relief against defendants' pattern of continuing violations of New York State's procedures for suspending students, established by § 3214 of the New York Education Law.[8] Further, the Decree settling the action provides a comprehensive plan for implementing procedural safeguards against racial discrimination in the City of Newburgh School District's disciplinary process. Since the relief obtained by plaintiffs favorably resolved their claims,[9] the Court finds that plaintiffs are a prevailing party within the meaning of § 1988.

### B. Multiplicity of Non-Productive Hours

■ Secondly, defendants argue that there was a multiplicity of nonproductive hours by plaintiffs' counsel which requires a reduction in the fee award. Specifically, defendants allege that the lodestar figure requested by plaintiffs should be substantially reduced because of an alleged (1) multiplicity of lead counsel, (2) lack of experience and motivation of said counsel, (3) turnover of attorneys, (4) piecemeal conduct of this litigation, and (5) lack of coordination between co-counsel.

### (1) multiplicity of lead counsel

An examination of the record indicates that over the six-year history of this case, several attorneys had primary responsibility for the litigation. This responsibility was shared, in part, due to the division of work between plaintiffs' counsel, the Mid-Hudson Valley Legal Services ("MH") and the Children's Defense Fund ("CDF").

The director of complex litigation at MH, William Crain ("Crain"),[10] testified that approximately seven months after the action was commenced MH sought out and retained CDF because (1) CDF had substantial expertise and background in class action litigation regarding the rights of children, and (2) MH had limited staff and

---

7. The Consent Decree provides, in pertinent part,

> Following a period of negotiations, plaintiffs and the School District have agreed to the entry of this Consent Decree which settles all claims against the School District except for the claim of attorneys' fees. Agreement to the entry of this Decree does not constitute an admission by any party as to any issue of fact or law regarding discrimination by and/or liability of the School District, nor does it constitute a waiver of plaintiffs' claim for attorneys' fees against the School District nor any defenses the School District may have against that claim.

*Ross v. Saltmarsh, supra* at Appendix A at 949.

8. *Ross v. Disare*, 500 F.Supp. 928 (S.D.N.Y. 1977).

9. *Ross v. Saltmarsh, supra* at 946.

10. Crain testified that MH's complex litigation includes discrimination and employment claims, welfare rights and migrant legal services (Transcript of Hearing before Magistrate Raby at 13). (References to the Hearing Transcript are hereinafter cited as "Tr. _____".)

resources to commit to an action which was "developing into a long complicated action" involving several "broad issues." [11] According to the testimony of Richard Sobol ("Sobol"), the attorney who committed CDF's financial resources and staff to this litigation, it was specifically CDF's interest in the subject area which resulted in the joint agreement for MH and CDF to litigate as co-counsel.[12]

Over the six years, four attorneys at MH, each at a different time, were lead counsel for MH's part of the litigation; [13] at CDF, three attorneys were lead counsel for CDF's part.[14] The changes in counsel were attributable to involvement in other cases requiring significant time and staffing demands, promotions involving substantial increases in administrative and supervisory responsibilities, or career changes involving termination of employment. The Court finds these reasons acceptable for the change in counsel, particularly when balanced against the following considerations: (1) the length of the litigation; [15] (2) that there is no evidence that this action was not forthrightly litigated, or that plaintiffs' claims were not amply protected, and (3) plaintiffs' counsel, in litigating this action, maintained an efficient and responsive litigating posture.[16]

**(2) lack of experience and motivation of said counsel**

Defendants argue that several of plaintiffs' attorneys lacked the requisite experience to be "lead" counsel and/or motivation to prosecute the case. Defendants specifically cite Magistrate Raby's finding,

"[M]id-Hudson and C.D.F. were excellent spawning grounds for neophyte attorneys. The case is notable in that it was prepared and prosecuted essentially by attorneys with little, if any, prior professional experience." [17]

The record reveals that three of plaintiffs' attorneys, with little or no trial experience, had significant responsibility for various aspects of the litigation—Harry Witte (MH), Laura Zeisel (MH), and Carol Golubock (CDF). Mr. Witte joined the MH staff in February, 1973 and became involved in this action in November, 1974, approximately one and a half years after his admission to the bar. He testified that between November, 1974 and the beginning of March, 1975, William Crain, the director of litigation at MH [18] and an attorney with over eight years of federal litigation experience, had primary responsibility for the case and directly supervised his involvement.[19] "Witte further stated that the increase in his responsibilities at MH in March, 1975 was in terms of time commitment" only. He also

---

**11.** Tr. 27, 38–39; *see also* Tr. 56, 71, 423–24.

**12.** Tr. 140–42. The working agreement was such that MH, as "local counsel", was responsible for all communications with the plaintiff and members of the class, monitoring defendants' activities in the subject schools, involvement in the student suspension hearings, and preliminary review of defendants' documents received in discovery to determine if defendants had complied with the discovery request (Tr. 28, 101, 261, 277–78, 341, 531–32). CDF was responsible for the litigation strategy, legal research, drafting of pleadings and discovery requests, and the detailed analyses of defendants' documents received in discovery (Tr. 58, 97, 102, 144, 276–78, 342–43, 373–77, 422).

**13.** William Crain, Harry Witte, (Mr.) Kelly, and Laura Zeisel.

**14.** Richard Sobol, Daniel Yohalem and Carol Golubock.

**15.** The Court notes that over the course of this litigation, there have been three substitutions

of the named defendant School Superintendent, *i. e.,* Klotz, Disare and Saltmarsh. Further, this action has been litigated before two judges of this Court.

**16.** Plaintiffs' counsel initially engaged in extensive discovery, then actively pursued settlement in 1979, after defendants had indicated a willingness to settle; when negotiations proved unsuccessful, counsel prepared and were ready for trial when the case settled.

**17.** Magistrate Raby's Report and Recommendation at 13–14.

**18.** As director of litigation at MH, Crain supervised state and federal court litigation at MH's Orange, Sullivan and Dutchess County offices; MH's Orange County office was responsible for litigating this action. (Tr. 12–13).

**19.** Tr. 64–65.

testified that from July, 1975 to December, 1975, when he was the managing attorney at MH's Newburgh office, "there was very little done" on the case and that he "claimed no time for that."[20]

Laura Zeisel had primary responsibility for the case at MH's Newburgh office in July, 1976, approximately five months after her admission to the bar. She was appointed managing attorney of the Newburgh office nine months after her admission.[21] Ms. Zeisel testified that in mid-1976 she supervised herself under the direction of Richard Sobol, an attorney with sixteen years of active practice primarily in the area of federal civil litigation[22] who was associated with CDF at the time and lead counsel on the case.[23] The record shows that during mid-1975 to February, 1979, Sobol was primarily responsible for all substantive decisions in the litigation.[24] Zeisel's role as "local" counsel at MH involved regular communications with plaintiff, review of discovery documents, and drafting some of plaintiff's papers in support of their motion for a preliminary injunction.[25] Further, Sobol, as senior attorney, attended most of the court appearances and depositions with Zeisel.[26]

Carol Golubock, employed by CDF, became involved in this litigation in February, 1979. Before her employment with CDF, Golubock was a staff attorney for over five years with a Legal Aid Society. During this time, she was primarily engaged in civil rights litigation in federal and state courts. Golubock testified that the majority of the cases assigned to her at Legal Aid were resolved through motion practice.[27] Three of her cases went to trial; none lasted more than a day.[28] Golubock's litigation experience also included conducting several depositions and an appeal. At the hearing, Golubock testified that she felt qualified to act as lead counsel given the resources she had to call upon.[29] These resources included Daniel Yohalem, Legal Director of CDF and co-counsel for plaintiffs from February, 1979 to present; he has over six years of extensive experience in state and federal civil rights litigation, including positions of lead or co-counsel.[30] Golubock also testified that she underestimated the actual time she worked on this case in order to offset her inexperience.[31]

The Court finds that attorneys Witte, Zeisel and Golubock did not lack the necessary experience to perform the legal services they rendered, and to do so in an efficient manner. Indeed, as a safeguard most of the work performed by these attorneys was supervised and/or directed by senior attorneys with substantial litigation experience.

Defendants also argue that plaintiffs' attorneys Steven Goode and Gerald Torres lacked the experience to perform the services they were assigned. Goode was employed by CDF from August, 1975 through April, 1977. He was admitted to the bar in 1975, and began working on this case in August, 1976. Goode's affidavit indicates that his efforts in this action primarily involved work on plaintiffs' motion for a preliminary injunction. Defendants contend that Goode lacked the experience to question the witnesses at the injunction hearing. The Court disagrees. Goode's affidavit reveals that he spent a substantial amount of

20. Tr. 64.

21. Tr. 266–67.

22. See Affidavit of Richard Sobol In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, dated September 6, 1979, at 4.

23. Tr. 144.

24. Tr. 144.

25. Affidavit of Laura Zeisel, dated August 22, 1979, at 2–9; Tr. 261.

26. Tr. 173–75, 180–81, 267.

27. Tr. 334–45.

28. Tr. 336.

29. Tr. 338.

30. Affidavit of Daniel Yohalem In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, dated September 2, 1980, at 1–2.

31. Tr. 363–65.

time preparing for the motion and hearing thereon. Although Goode experienced some initial problems at the start of the questioning,[32] there is no indication that the overall questioning was inefficient or inadequate. Moreover, Goode's work prior to and at the hearing was supervised by senior attorneys, and this joint effort resulted in an award of a preliminary injunction.

Gerald Torres was also employed by CDF. During the time for which plaintiffs seek compensation for his services, September, 1977 through November, 1977, Torres was not admitted to the bar. His work on the case involved discovery, specifically the categorizing of documents pertaining to the preparation of a proposed code of discipline for the Newburgh School District. Defendants argue that Torres lacked the statistical background, and experience as a teacher, to have been assigned responsibilities in this area. The Court disagrees. The record indicates that Torres worked closely with Paul Smith, the data analyst at CDF, and that the initial determination and setting-up of the respective categories was done by senior attorneys Sobol and Goode.[33]

Defendants also contend that plaintiffs' senior attorney Richard Sobol lacked motivation and commitment to the prosecution of the case. Defendants partially attribute this to a change in the compensation arrangement between Sobol and CDF.[34] Defendants also cite the following excerpt from Sobol's testimony at the hearing:

QUESTION: Mr. Sobol, did you ever, in words or in substance, tell someone, either myself, Mr. Spector or one of the board members that you personally never intended to try this case but if it would go to trial you would in effect give the matter up to another counsel from Children's Defense Fund and let them try it, that you were just trying to take it as far as trying to dispose of the matter by way of settlement?

ANSWER: That was true. Whether I said it or not to people that you mentioned, I don't know, but that is true. After we got into the settlement discussions, I hoped I saw the end in sight. I was handling the case at a loss and I didn't want it to be a life's work. and when I went to the hourly basis with the Children's Defense Fund, it was not with the idea in mind that the case would go on forever, and I thought that the case would be settled and I had every reason to believe that from the indications I had from your office, and when it turned out that you were not authorized to conduct the discussions that you were conducting, I wanted the case to go back where it came from, yes.

Tr. 215–16. The Court disagrees with defendants' characterization of Sobol's commitment. Sobol's Supplementary Affidavit In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, dated August 28, 1980, indicates that, contrary to defendants' assertion, Sobol made a significant time commitment to prosecution of the action following his revised compensation agreement with CDF. Further, Sobol's testimony reveals that he did not expect to try the case because he believed "the end was in sight" due to the settlement negotiations that were ongoing at the time.

### (3) turnover of attorneys

Defendants assert that the rapid turnover of plaintiffs' attorneys associated with the case increased the amount of time expended by each individual attorney and concomitantly increased the amount of reimbursement sought by plaintiffs for attorneys' fees. Defendants allege the following list of plaintiffs' attorneys involved in this action, and each attorney's tenure:

32. *See* Tr. 298.

33. Tr. 240–42.

34. Sobol initially started working in this case in mid-1975; at that time, he was employed by CDF on a "half-time" basis, the remaining time he was engaged in private practice. In June, 1976 Sobol's compensation arrangement with CDF was revised and he was paid on an hourly basis at the same hourly rate as his prior salary, plus overhead (*i. e.*, $18/hour (salary) plus $12/hour (overhead) for a total of $30/hour). *See* Tr. 154–55.

1. William E. Crain, November 1974 through April 1975 (Mid-Hudson).
2. Harry L. Witte, November 1974 to July 1975 (Mid-Hudson).
3. Laura Zeisel, May 1976 through November 1979 (Mid-Hudson).
4. Richard Sobol, June 1975 through February 1979 (CDF).
5. Steven Goode, August 1976 through April 1977 (CDF).
6. Carol Golubock, March 1979 to Present (CDF).
7. Daniel Yohalem, February 1979 to Present (CDF).
8. Gerald Torres, September 1977 to June 1978 (CDF).
9. Wayne Rubin, November 1978 to October 1979 (Mid-Hudson).
10. Mr. Juneau (Time Period, unknown) (CDF).
11. Clarence Daniels, March 19, 1979 (as a legal assistant) (June 14, 1979, as an attorney) to Present (CDF).
12. Mr. Kelly, Eleven month period (Mid-Hudson).

[footnotes omitted].

Defendants' Post Hearing Memorandum In Opposition to Plaintiffs' Claim for Attorneys' Fees at 28–29. The Court finds defendants' claim without merit. The record shows that part of the turnover of plaintiffs' attorneys was attributable to career change departures, increased responsibilities in other cases, promotions, and the limited legal staff at MH. Further, plaintiffs' senior attorneys often delegated less complex tasks to junior staff attorneys; this arrangement is the normal partner/associate or senior associate/junior associate working relationship in most legal firms.[35]

### (4) piecemeal litigation

Defendants argue that plaintiffs' counsel unnecessarily conducted the prosecution of this action in a "piecemeal" manner which resulted in a multiplicity of non-productive hours. Specifically, defendants cite (1) the number of times the complaint was amended, (2) plaintiffs seeking preliminary injunctive relief on their pendent state law claims and eschewing their federal claims, and (3) plaintiffs' numerous discovery requests in 1979.

This Court, in granting plaintiffs preliminary injunctive relief on their pendent state law claims, admonished plaintiffs for their piecemeal litigation of the issues in this case.[36] The Court was addressing the decision of plaintiffs' counsel to seek injunctive relief on limited issues more than two years after the suit had been commenced. For the following reasons, however, the Court finds that there was no multiplicity of non-productive hours by plaintiffs' counsel which would warrant a reduction in the lodestar figure: (1) the record indicates that the complaint was amended four times—one amendment was technical, three were substantive. The first two substantive amendments added new factual and statistical information obtained by plaintiffs in discovery, and a cause of action under the Equal Educational Opportunities Act of 1974, 20 U.S.C. § 1701 et seq.[37] The third substantive amendment, adding a Title VI claim, was sought as a result of a significant development in the case law, and only after serious settlement negotiations between the parties had failed;[38] (2)

---

**35.** Magistrate Raby made a similar finding at the hearing—"THE MAGISTRATE: All right. The Court takes judicial notice of the fact that in a case of this magnitude it is the rule rather than the exception to have a junior and senior attorney working together on a matter and attending a deposition together." Tr. 264.

**36.** *Ross v. Disare, supra* at 930 n.1.

**37.** Tr. 34–36; 68–69.

**38.** Sobol testified that based on the United States Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), the complaint was substantively amended a third time "to state a claim under Title 6 [sic] of the Civil Rights Act in order to get an alternative basis for liability that would not involve a showing of intent...." (Tr. 230–31). In *Washington*, the Supreme Court held that in cases alleging ra-

plaintiffs sought preliminary injunctive relief on their pendent state claims because, as the record indicates, defendants were engaging in a pattern of continuing violations of the state procedures for suspending students established by § 3214 of the New York Education Law. Through discovery, plaintiffs obtained the factual and statistical data to support such relief. Plaintiffs sought injunctive relief after they had sufficient information to support their claim, and because defendants' violations continued despite institution of this action; accordingly, such relief was warranted and granted. Moreover, the record shows that plaintiffs were still engaged in active discovery with respect to their remaining claims; (3) plaintiffs sought additional discovery in 1979 because of discovery requests vigorously contested by defendants. The record reveals that plaintiffs filed four different motions to compel, all of which were granted by the Court.[39]

### (5) lack of coordination between co-counsel

Defendants contend that the failure of MH and CDF to conduct regularly scheduled meetings to coordinate their divergent tasks, and the failure to have intra-organizational meetings suggests duplicity and waste. The Court disagrees. Plaintiffs' counsel testified that the separate tasks of each organization were clearly delineated at the beginning of the suit.[40] Further, although there was no specific attorney at either organization designated as a liaison, the record clearly shows that MH and CDF worked in a coordinated manner when required, and consulted each other by telephone or personal visit when necessary.[41] In addition, the record reveals that the attorneys within each organization worked together on a regular basis, even though regular intra-organizational meetings were not held.[42]

### C. Reconstruction of Time Records

█ Defendants' third objection is that the Court should increase the reduction recommended by Magistrate Raby with respect to counsel's reconstruction of their time records. The record indicates that some of plaintiffs' attorneys maintained contemporaneous time records, while others either partially or totally reconstructed their records for which an award is sought. Plaintiffs allege that in the early years of this litigation, contemporaneous records were not maintained because there was no statutory provision, such as 42 U.S.C. § 1988, to allow for an award of attorneys' fees in this type of action. Following the enactment of § 1988, plaintiffs' counsel reconstructed their time for the work previously done and commenced maintaining contemporaneous

cial discrimination in violation of constitutional rights arising under the Fifth and Fourteenth Amendments, the plaintiff must show an intent to discriminate in order to sustain his burden of proof. 426 U.S. at 238–39, 96 S.Ct. at 2046–47. Sobol stated that although *Washington* was decided in mid-1976, plaintiffs did not seek to amend the complaint with a Title VI claim at that time since settlement discussions between the parties had started. Tr. 230. The possibility of settlement was first raised by defendants in September, 1977; discussions continued for over one year and an apparent settlement fell through in November, 1978. In February, 1979, plaintiffs sought to amend their complaint with their Title VI claim.

**39.** (1) plaintiffs' motion to compel supplemental responses to plaintiffs' request for supplementation of defendants' prior responses to second request for production of documents (filed May 9, 1979; granted July 9, 1979); (2) plaintiffs' motion to compel supplemental responses to plaintiffs' request for supplementation of first and third requests for production of documents and first and third sets of interrogatories (filed May 19, 1979; granted July 9, 1979); (3) plaintiffs' motion to compel responses to plaintiffs' fourth set of interrogatories and fourth request for production of documents (filed May 31, 1979; granted July 9, 1979); (4) plaintiffs' motion to compel responses to deposition questions (oral motion made June 19, 1979; granted June 19, 1979).

**40.** *See supra* note 12, at 755.

**41.** *See, e. g.,* Tr. 342–47; 102–05; 122–23; 145–46; 170–75; 180–81; 291–93.

**42.** *See, e. g.,* Tr. 28–29; 32–33; 41; 51–52; 62; 99; 168–69; 438–42; 455; 460–61.

time records.[43] Magistrate Raby recommended that plaintiffs' attorneys who totally reconstructed their time records be penalized with a ten percent (10%) reduction of their total charges, and those attorneys who relied on partially reconstructed records be penalized with a five percent (5%) reduction.[44] The Court finds the Magistrate's recommendation reflects an appropriate penalty reduction. *See, e. g., Kane v. Martin Paint Stores, Inc.,* 439 F.Supp. 1054, 1057 (S.D.N.Y.1977), *aff'd without opinion,* 578 F.2d 1368 (2d Cir. 1978) (ten percent reduction imposed); *see also Fischer v. International Tel. and Tel. Corp.,* 78 F.R.D. 237, 248 (E.D.N.Y.1978).

### D. *Duplication of Time*

■ Defendants next argue that plaintiffs' fee award should be reduced because of an alleged duplication of time by plaintiffs' attorneys in attending depositions, court conferences and hearings, and reviewing discovery material. The Court finds defendants' claim without merit. The Court agrees with the Magistrate's findings that a case of this magnitude often requires more than one attorney for various aspects of the litigation, including depositions, court conferences and hearings.[45] In this case, multiple attorneys usually attended the Court's conferences and hearings because of the division in litigation tasks between MH and CDF; if oral argument was required, then the attorney responsible for that issue was present.[46] This division of responsibility also included counsel's review of the discovery documents. As indicated earlier in this Opinion, MH reviewed documents received from defendants to assure compliance with the request; CDF's attorneys engaged in the substantive analysis and classification of these documents. This multiple review of defendants' discovery documents was consistent with the primary duties of each organization—MH as "local" counsel, CDF as "lead" counsel directing and planning plaintiffs' litigation strategy.

### E. *Administrative and Clerical Charges*

■ Defendants also argue that the Magistrate erred by failing to recommend a reduction in plaintiffs' fee award to account for purely administrative and clerical activities performed by plaintiffs' counsel. Although routine administrative and clerical matters receive a lower valuation than complex ones,[47] Magistrate Raby concluded: "[C]ontrary to defendants' ·assertions ... there seem to be but few ascertainable charges that may fairly be characterized as being of an 'administrative' or 'clerical' nature. Having so concluded, I decline to assess a penalty against plaintiffs' counsel on this point." Magistrate Raby's Report and Recommendation at 22. Specifically, defendants cite as examples of non-legal work: (1) the time CDF attorney Golubock spent reviewing files, preparing statistical documents, and reviewing discovery; (2) the time MH attorney Zeisel and CDF attorney Daniels spent interviewing witnesses; and (3) counsel's time spent in conjunction with actual settlement of the case.

The Court finds that attorney Golubock's activities in reviewing files, etc. cannot be deemed administrative or clerical in nature. Golubock testified that, in her role as lead counsel, she scrutinized defendants' files because the information gathered therefrom was a crucial element of plaintiffs' case; further, she stated that after an initial analysis to determine a "standard of proof,"

---

**43.** Tr. 44–46; 142; 284–85. The Magistrate stated in his report at 18 n.18:

> The fact that the present litigation was instituted prior to the enactment of the Civil Rights Attorneys Fees Awards Act (1976) may serve to explain why more accurate records were not maintained throughout the course of the lawsuit. Counsel had no expectation of recompense (see, e. g., Tr., at pp. 142 and 284) and therefore perceived no need for elaborate or formal records.

**44.** Magistrate Raby's Report and Recommendation at 16–19 & Appendices D and E.

**45.** *See supra* note 36, at 760.

**46.** *See, e, g.,* Tr. 62–63; 104–06; 180–81; 296.

**47.** *See Desimone v. Industrial Bio-Test Laboratories, Inc.,* 83 F.R.D. 615, 621 & n.15 (S.D.N.Y. 1979); *Kane v. Martin Paint Stores, Inc., supra,* 439 F.Supp. at 1055–56.

she delegated the task to junior members of her staff.[48] Accordingly, Golubock's review of these files was consistent with her role as planner and director of the litigation, and, as the record reveals, she assigned this task to junior staff for the less complex functions.

The time spent by Zeisel and Daniels interviewing witnesses also cannot be considered administrative or clerical. The record shows that Zeisel, as local counsel, had the primary responsibility and duty of communicating with plaintiffs and members of the class, and monitoring defendants' activities in the Newburgh School District with respect to the suspension and disciplining of students. Zeisel interviewed approximately thirty-five witnesses in late 1978 to mid-1979 in preparation for trial and in order to determine possible violations of the Court's preliminary injunction Order.[49] Many of these witnesses had not been previously interviewed since they were new members of the plaintiff class;[50] others that she interviewed were potential expert witnesses. These interviews directly pertained to substantive litigation activities involved in the case at the time. Daniels testified that shortly before the action was scheduled for trial, he interviewed numerous witnesses in preparation for their testimony at trial. The Court does not consider this interview-

---

**48.** Golubock testified on this issue as follows:

QUESTION: Well, how much time would you say you spent revewing [sic] the guidance files?

ANSWER: I would say that my time records are contemporaneous and I would feel comfortable saying that is what I spent.

QUESTION: And you would say you spent all of that time reviewing guidance files and not—

ANSWER: I delegated a task that I felt could be performed by paralegals and junior attorneys.

QUESTION: And this wasn't one of the tasks that you felt could be delegated to a junior attorney?

ANSWER: In fact, I did, after I did some analysis of the files. They were voluminous files. They were a very, very important part of our case because we were going to be required to show instance [sic] of intentional discrimination. To detect intentional discrimination was not an easy task. I did not feel ready until I had reviewed the files and decided the kinds of things that I needed for that standard of proof. Once I had, I did delegate to the several law students who spent many, many hours doing that task, and I don't remember at all whether I had Mr. Daniels doing that task also.

QUESTION: What you are trying to say is that it took, by Mr. Yohalem's calculation, some 30-odd hours and by mine, 40 hours, to establish a notion of what you wanted, and having established that notion, assigned it to paralegals and junior counsel?

ANSWER: I am saying that there was no prior case law that I could turn to which gave examples of the kinds of acts by teachers and administrators or school boards that would constitute intentional discrimination in this area. This was in fact a case de novo. It was the first kind of case where people were going to be put on the stand, where there was going to be a trial showing intentional discrimination in discipline, and I regard that as a very important and a very serious and a very difficult task. I spent a lot of time reviewing a lot of things, talking to a lot of witnesses. I felt that this was a very, very important case and therefore, I put a lot of energy into this case.

QUESTION: Your intent in reviewing the guidance files was to try to establish intentional discrimination?

ANSWER: I'm afraid it wasn't quite that simple. It was often determining which teachers we thought it would be important to depose. I mean, we had three schools. There was no way we could depose every single teacher or every single administrator. We had to make selections. The only data we had to make that selection from were these guidance files. In these files were recorded discipline and referrals on discipline. There was also a great deal of commentary by teachers and administrators which indicated their opinions of students. We thought those opinions were very, very relevant to our case.

THE MAGISTRATE: Would you say that the guidance files in the aggregate constituted the basis of your case?

THE WITNESS: I would say they were a very, very important part of the case, your Honor, yes.

THE MAGISTRATE: The raw material, as it were?

THE WITNESS: Really the raw material of the case.

Tr. 400–403.

**49.** Tr. 307–12. Zeisel testified that during this time plaintiffs' counsel were contemplating a contempt motion against defendants for noncompliance with the Court's preliminary injunction Order. Tr. 309–10.

**50.** Tr. 311–12.

ing administrative or clerical in nature, particularly when balanced against the fact (1) Daniels was one of the most junior members of counsels' staff, therefore, billing at an appropriately lower rate, (2) the time pressure of the scheduled trial date, and (3) the primary responsibility of Daniels in October, 1979 was the interviewing and preparation of witnesses.

Defendants' final contention is that the time plaintiffs' counsel spent in settlement negotiations should be reduced since it was administrative in nature. Defendants cite as support *City of Detroit v. Grinnell Corp., supra,* 560 F.2d at 1099–100. In *Grinnell,* the Court of Appeals held, in connection with an attorneys' fee award, that counsels' activities of investing or distributing a settlement fund *post* settlement were essentially routine, and therefore "administrative." This was not the situation in this action, where plaintiffs' counsel was attempting to negotiate a successful settlement. Counsels' efforts, although initially unsuccessful, eventually led to the resolution of this bitterly contested action. Further, in contrast to *Grinnell,* the duties of plaintiffs' counsel in this action *post* settlement were certainly not routine; plaintiffs' counsel, together with defendants' counsel, were active participants in the implementation of the goal of the Consent Decree, *i. e.,* the elimination of racial disparities in suspension rates by reducing the overall number of suspensions in the Newburgh School District.[51]

## F. Plaintiffs' Fee for Litigating the Attorneys' Fee Claim

■ Defendants argue that plaintiffs' request for attorneys fees for litigating the fee claim should be decreased since defendants, by opposing plaintiffs' total fee claim, have achieved a substantial reduction in plaintiffs' fee award as recommended by the Magistrate. The Court finds that defendants' argument is without merit. In *Gagne v. Maher,* 594 F.2d 336, 343–44 (2d Cir. 1979), *aff'd* 448 U.S. 122, 100 S.Ct. 2570, 65 L.Ed.2d 653 (1980), this Circuit's Court of Appeals approved the concept of allowing reasonable recompense for litigating the fee claim where, as here, the payment of attorneys' fees will come completely from defendants *and will not affect plaintiffs' recovery.* In this action, Magistrate Raby found that the total number of hours claimed by plaintiffs' counsel on this aspect of the litigation to be reasonable, particularly in light of defendants' defense tactics.[52] In response to these tactics, plaintiffs' counsel spent the necessary time drafting affidavits and reviewing time sheets and other records to substantiate and defend their fee request. Although defendants successfully contested some of plaintiffs' fee claim, there is no indication that

---

**51.** Paragraphs 8 and 9 of the Consent Decree provide:

8. The consultant shall advise the defendants of and develop written plans for all steps necessary to the elimination of the racial disparities in suspension rates at Newburgh Free Academy, North Junior High School and South Junior High School.

9. *The consultant shall meet with* students, parents, teachers, administrators, Board of Education members, and *attorneys for both parties in order to assess what is necessary for the elimination of the racial disparities in suspension rates. The consultant shall continue to consult with the above-named individuals during the course of the contract.* [emphasis added].

*Ross v. Saltmarsh, supra* at 939.

**52.** In the case at bar, plaintiffs' counsel have requested compensation for a total in excess of 3100 hours, of which only a few hundred were spent in connection with the claim for

attorneys' fees. Moreover, counsel for defendants continuously obstructed plaintiffs' counsel even in legitimate attempts to prove entitlement to reasonable recompense. Every conceivable legal obstacle was deployed by defendants to stymie plaintiffs' progress and to discredit their testimony. Never at a loss for a counter-argument, defendants' counsel have themselves augmented, if not precipitated, many of the claims. Finally, plaintiffs' counsel were acting prudently to prepare properly for the microscopic analysis to which defense counsel adhered throughout the hearing.

In light of the foregoing, I cannot say that plaintiffs' counsel devoted an inordinate amount of time in connection with their fee application; the time so claimed should be allowed.

Magistrate Raby's Report and Recommendation at 23–24.

the time spent by plaintiffs' counsel in litigating this claim was either duplicative or excessive.

G. *Billing Rates*

Magistrate Raby recommended that the hourly rate of compensation be reduced for plaintiffs' attorneys who commenced working on this litigation prior to being admitted to the bar. With respect to these attorneys, Messrs. Torres, Daniels and Rubin, the Magistrate recommended a "pre-admission" rate of $40/hour, and a "post-admission" rate of $55/hour for Torres and Daniels and $75/hour for Rubin for services performed during their first year of practice. For attorney Zeisel, who had been admitted to the bar approximately three months before she started working on this litigation, Magistrate Raby recommended compensation of $75/hour for services performed during the first two years of practice, and $90/hour for services rendered in the third year and thereafter.[53]

■ Defendants argue that the post-admission rates for Rubin and Zeisel should be reduced to the same $55/hour rate recommended for Torres and Daniels. The Court disagrees. In determining the rate of compensation, the Court uses "the hourly rate normally charged for similar work by attorneys of like skill in the area." *City of Detroit v. Grinnell Corp., supra*, 560 F.2d at 1098. At the time Rubin and Zeisel rendered their services, both were members of MH's Orange County office, which is located in the Southern District.[54] The affidavit of John Gorman, executive director of MH, states that MH has a billing rate schedule of $75/hour for attorneys with experience of two years or less, and $90/hour for those with three or more years experience.[55] This Court has awarded to MH, plaintiffs' attorneys, in cases similar to this one, fees calculated on the basis of directly comparable rates. *See, e. g., Bradford v. Blum*, 507 F.Supp. 526, 535 (S.D.N.Y.1981) (Cannella, J.) (fees for MH calculated at $75/hour for attorneys with less than two years experience, and $90/hour for those with more than two years experience); *Becker v. Blum*, 487 F.Supp. 873, 876 (S.D.N.Y.1980) (Broderick, J.) (fees for MH calculated at $75/hour for attorneys with less than two years experience, and $90/hour for those with more than two years experience). Accordingly, the Court approves these rates and adopts Magistrate Raby's recommended post-admission hourly rate allowance for attorneys Rubin and Zeisel.

H. *Time Charges*

■ Defendants contend that plaintiffs' time charges are excessive and should be reduced. Specifically, defendants cite: (1) the 149 hours and 15 minutes billed by CDF attorney Goode in preparation and presentation of plaintiffs' preliminary injunction motion;[56] (2) the approximately 84 hours billed by CDF attorney Golubock for work on plaintiffs' motions to compel,[57] and the 77 hours for work on the pretrial order;[58] and (3) the 80 hours billed by CDF attorney Daniels in preparation for the depositions of four individuals employed by defendant School District, and the 36 hours billed for preparation of a legal memorandum on attorney-client privilege.[59]

The time billed by attorney Goode, for services rendered over a ten month period,

53. Magistrate Raby's Report and Recommendation at 14–15.

54. Attorneys Torres and Daniels were employed by CDF, which is located in Washington, D. C.

55. Affidavit of John Gorman, dated September 14, 1979, at 2–3, paras. 6 and 8.

56. *See* Affidavit of Steven Goode, dated August 21, 1979, at 1, para. 6.

57. *See* Defendants' Exhibit C at evidentiary hearing (i. e., time estimate by Golubock prepared for defendants' attorney Leonard McCue in connection with negotiations regarding settlement of the attorneys' fees issue); Tr. 347–49.

58. *See* Memorandum In Support of Plaintiffs' Statement of Attorneys' Fees and Costs for Entire Action, dated September 2, 1980, at 7, para. 6.

59. *See* Tr. 468–69.

appears reasonable and not excessive considering Goode's testimony at the hearing (a) that he and MH attorney Zeisel were responsible for the majority of the work on the preliminary injunction motion, including the initial and final drafting of the papers, (b) that he was responsible for conducting the examination of plaintiffs' key witness at the injunction hearing, and (c) that he expected to personally testify at the injunction hearing.[60] Nor is the time billed by attorney Golubock unreasonable or excessive. She testified, and the record clearly reveals, that defendants vigorously opposed all of plaintiffs' discovery motions, raising several legal points in their numerous objections which plaintiffs undertook to brief thoroughly.[61] Further, Golubock's hours billed for work on the pretrial order *and* a pretrial memorandum are reasonable considering the duration of this litigation and the extensive discovery.

■ With respect to the time billed by CDF attorney Daniels, the Court finds that 80 hours of preparation for four depositions is excessive. Daniels testified, and his time records indicate that he conducted all four depositions in a total of eighteen hours.[62] In comparison, his time records also reveal that he conducted depositions of two other defendant employees in nine hours, with only two hours of preparation.[63] The Court finds that twenty hours more accurately reflects an appropriate amount of time to have prepared for the four depositions. However, the Court finds that the thirty-six

hours Daniels spent preparing the legal memorandum on attorney-client privilege was not excessive. Defendants have not presented any support for this claim, nor is there any indication in the record or testimony to suggest an excess of time with respect to this research.

After reviewing the record, the Court finds that there are no other instances of excessive time charges that should be reduced.

### III. *Plaintiffs' Objections*

#### A. *Richard Sobol's Legal Services*

■ At the outset of this litigation, Richard Sobol was a salaried employee of CDF. In June, 1976 he entered private practice, but agreed with CDF to continue working on this litigation for $30/hour. At that time, this figure represented the same hourly rate he received at CDF as a salaried attorney ($18/hour) plus the hourly rate of his overhead ($12/hour). Plaintiffs, in their fee application, seek reimbursement for Sobol's services performed under this arrangement at "prevailing" hourly rates ranging from $75/hour to $90/hour. Magistrate Raby, in his report, characterized such reimbursement as "unjust enrichment," and recommended compensation at $40/hour, that is, CDF's actual costs plus an adjustment for inflation.[64] Plaintiffs disagree with the Magistrate's recommendation and reassert their argument that the Court should award Sobol's fee at prevailing rates.[65]

60. Tr. 101–07.

61. Tr. 374–78.

62. Tr. 464–66; Defendants' Exhibit E at evidentiary hearing, at 2–4 (*i. e.*, Memorandum from Daniels to Golubock, dated November 13, 1979, listing a "weekly breakdown" of Daniels time on this case).

63. Defendants' Exhibit E at evidentiary hearing, at 3; *see* Tr. 466.

64. Sobol has submitted time records only for those services he rendered between July, 1976, when he started the $30/hour "arrangement" with CDF, and February, 1979, when he terminated his active involvement in the litigation. Sobol states that the reason for this limited fee request is because he did not maintain contem-

poraneous time records on this case prior to July 1, 1979. Affidavit of Richard Sobol In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, dated September 6, 1979, at 2, para. 3. CDF does not seek attorneys' fees for any time spent by Sobol prior to July, 1976 while he was an employee of CDF.

65. Plaintiffs request compensation for Sobol's services as follows:

| Year | Hourly Rate |
| --- | --- |
| 1976–77 | $75 |
| 1978 | $80 |
| 1979–80 | $90 |

Plaintiffs' Objection to Report of Magistrate, at 8.

The Court agrees. Although plaintiffs have not cited any authority where this type of fee arrangement has been examined, other similar arrangements suggest that the reimbursement of Sobol's time at prevailing rates is consistent with this Circuit's rule that 42 U.S.C. § 1988 be applied broadly to achieve its remedial purpose. *See Mid-Hudson Legal Services, Inc. v. G & U, Inc.,* 578 F.2d 34, 37 (2d Cir. 1978).[66]

■ This Circuit has consistently held that fee awards involving public interest legal services are measured by the value of the services performed, without regard to the non-profit or public interest nature of the legal work done. *See Torres v. Sachs,* 538 F.2d 10, 13 (2d Cir. 1976); *Beazer v. New York City Transit Authority,* 558 F.2d 97, 100 (2d Cir. 1977), *rev'd on other grounds,* 440 U.S. 568, 99 S.Ct. 1335, 59 L.Ed.2d 587 (1979); *see also Carey v. New York Gaslight Club, Inc.,* 598 F.2d 1253, 1255 n.1 (2d Cir. 1979), *aff'd* 447 U.S. 54, 70 n.9, 100 S.Ct. 2024, 2034 n.9, 64 L.Ed.2d 723 (1980). This standard of measure should not use the salaries paid to legal services attorneys as a guidepost because traditionally these salaries are not indicative of the true value of the services rendered. As this Court (Broderick, J.) observed in *Becker v. Blum, supra,*

> The value of legal services attorneys' services are not reflected by their salary; the disparities between the salaries of legal services attorneys and private practitioners 'usually reflect the relative poverty of legal services funding.' *Rodriguez v. Taylor,* 569 F.2d 1231, 1248 (3d Cir. 1977), *cert. denied,* 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978). Legal

services attorneys are paid (and accept) lower salaries in order that the limited funds available may generate the greatest possible volume of legal services for the needy. Since Section 1988 of Title 42 authorizes the award to the prevailing party of 'a reasonable attorney's fee,' the salaries paid to legal services attorneys do not furnish acceptable guideposts. '[T]o the extent salary levels are relevant, the appropriate referent would be comparable salaries earned by private attorneys with similar experience and expertise in equivalent litigation.' (*Rodriguez v. Taylor, supra* at 1248).

*Id.* at 875. Prior fee awards by this Court to public interest attorneys have been granted without reference to the salaries those attorneys were paid. *See, e. g., Becker v. Blum, supra; Mid-Hudson Legal Services v. G & U, Inc.,* 465 F.Supp. 261, 270 (S.D.N.Y.1978); *Swift v. Blum,* 502 F.Supp. 1140, 1146 (S.D.N.Y.1980); *Bradford v. Blum, supra.* Similarly, courts have held it improper to limit or deny a fee award because the attorney was employed or funded by a civil rights organization and/or tax exempt foundation, *Fairley v. Patterson,* 493 F.2d 598, 606 & n.14 (5th Cir. 1974), or that the attorney has an agreement that the organization employing him will receive any awarded attorneys' fees, *Id.* at 607; *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1148 (4th Cir. 1975).

In this action, CDF paid Sobol approximately $15,600 under their fee arrangement.[67] Reimbursement of Sobol's time at the rate recommended by the Magistrate will result in an award to CDF of $20,908;[68]

---

**66.** [T]he legislative history of § 1988 indicates the concern of the Congress that attorneys who are acting as private attorneys generally receive reasonable compensation for their services. 'The remedy of attorneys' fees has always been recognized as particularly appropriate in the civil rights area, and civil rights and attorneys' fees have always been closely interwoven. In the civil rights area, Congress has instructed the courts to use the broadest and most effective remedies available to achieve the goals of our civil rights laws.' Senate Report, *supra,* at 5910–11.

See, e. g., *Northcross v. Memphis Board of Education,* 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973); *Newman v. Piggie Park Enterprises, Inc.,* 390 U.S. 400, 402, 88 S.Ct. 964, 966, 19 L.Ed.2d 1263 (1968); *Fort v. White,* 530 F.2d 1113, 1118 (2d Cir. 1976). *Mid-Hudson Legal Services, Inc. v. G & U, Inc., supra.*

**67.** *See* Tr. 156.

**68.** *See* Magistrate Raby's Report and Recommendation at Appendices D and E.

at the rates requested by plaintiffs, CDF will receive $40,616.75.[69] However, reimbursement under Magistrate Raby's recommendation does not reflect the true value of Sobol's legal work in this action. Based on Sobol's sixteen years experience in civil rights litigation, and the work he performed, plaintiffs' requested hourly rates of compensation are comparable to those of private attorneys in the Washington, D.C. area at the time the services were rendered. *See, e. g., Blake v. Hoston*, 513 F.Supp. 663, 666 (D.D.C.1981); *Snead v. Harris*, 25 Empl. Prac.Dec. 19,375 (D.D.C.1981); *Williams v. Civiletti*, 487 F.Supp. 1387, 25 Empl.Prac. Dec. 19,175 (D.D.C.1980); *Bachman v. Pertschuck*, 19 Empl.Prac.Dec. 6500 (D.D.C. 1979).

Magistrate Raby's finding that an award for Sobol's services at these higher hourly rates would amount to unjust enrichment is not persuasive considering that any award granted CDF for Sobol's services will be used exclusively to support public interest and civil rights activities.[70] As this Court (Broderick, J.) observed in *Becker v. Blum, supra,* concerning the use of a fee award to MH in that action, "The award will not be used to increase the compensation to the attorneys, but will be used to expand the services being provided to the members of the public who qualify for such services." *Id.* at 875. Moreover, the principle of unjust enrichment seems particularly inapplicable in this situation considering not only the use of any attorneys' fee award by a non-profit public interest legal organization, but more importantly the *raison d'etre* for such organization: "Despite the often insignificant potential monetary benefits in individual cases, legal services organizations render valuable services to their clients and their communities. Legal aid organizations often are the sole representatives of the economically, socially and culturally deprived in their disputes with landlords, government welfare agencies, employers and creditors." *Rodriguez v. Taylor, supra* at 1248.

For these reasons, the Court awards plaintiffs compensation for Sobol's services at the requested hourly rates.[71]

## B. *Data Analysts' Services*

■ Plaintiffs contend that Magistrate Raby erroneously denied plaintiffs reimbursement for the services that data analysts Paul Smith and Shannon Ferguson performed in connection with this action. The Magistrate found (1) that Smith and Ferguson were employees of CDF, (2) that their salaries were an element of CDF's overhead, (3) that CDF's overhead was presumably computed into their attorneys' hourly billing rates, and (4) that a separate award for Smith's and Ferguson's services would constitute a double recovery, and therefore should be denied. Plaintiffs argue that Smith's and Ferguson's wages were not part of CDF's overhead that was included in the customary attorney hourly rates, and therefore, plaintiffs are entitled to recover the actual out-of-pocket costs for their services.[72]

A review of the record indicates that at the time Smith and Ferguson worked on the case, both were salaried employees of CDF,[73] and not independent contractors.[74]

69. *See supra* note 66, at 766.

70. The children's Defense Fund is a non-profit public interest organization. All attorneys fees earned are used to support public interest and civil rights activities. No attorney is enriched by the award of attorneys fees. The organization earns no profits; the amount of attorneys fees it can receive each year is strictly regulated by federal law to insure fees received are below a specified percentage of its operating costs.
Plaintiffs' Objection to Report of Magistrate, at 8.

71. *See supra* note 66, at 766.

72. Plaintiffs seek $15,742.50 for Smith's services, and $429.10 for Ferguson's services.

73. Smith is the director of research at CDF. He supervises the entire research staff and is in charge of arranging for the completion of all computer work. Ferguson is a staff researcher at CDF who worked under Smith's direction in the preliminary stages of the data analysis. Affidavit of Paul Smith In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, at paras. 1–3, 6, 8, 12 and 13.

74. *See* Tr. 211–13. Smith and Ferguson never testified at the hearing. At a pretrial confer-

At the evidentiary hearing, plaintiffs' attorney Golubock stated that CDF viewed Smith and Ferguson as independent data analysts, billable as an itemized cost and not as an expense included in overhead.[75] However, plaintiffs' attorney Sobol testified that although he charges clients separately for the services of a data analyst, he did not know whether in his private practice these services are accounted for in his overhead.[76]

This Circuit's Court of Appeals held in *City of Detroit v. Grinnell Corp., supra,* 495 F.2d at 473, that an award of attorneys' fees properly includes reimbursement for the actual wages paid paraprofessional assistants. In a subsequent opinion, *City of Detroit v. Grinnell Corp., supra,* 575 F.2d at 1010, the Court of Appeals also allowed reimbursement to plaintiffs for the out-of-pocket costs of an accountant. Awards of attorneys' fees by the district courts in this Circuit have consistently included as a reimbursable expense, the costs of paralegals, *see, e. g., City of New York v. Darling-Delaware,* 440 F.Supp. 1132, 1136 & n.9 (S.D.N.Y.1977);[77] *Desimone v. Industrial Bio-Test Laboratories, Inc., supra* at 622 and 623; *Baron v. Commercial & Industrial Bank of Memphis,* [1979–80 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 97,132 at 96,244 & n.17 (S.D.N.Y.1979); and accountants, *see, e. g., Levenson v. Overseas Shipholding Group, Inc.,* 84 F.R.D. 354, 360 (S.D.N.Y.1979); *Kane Associates v. Clifford,* [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,384 at 97,353 (E.D.N.Y.1980). This Court has also included in fee awards compensation for services rendered by various experts. *See, e. g., Zipkin v. Genesco, Inc.,* [1980 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 97,594 at 98,152 (S.D.N.Y.1980) (brokerage expert); *DelNoce v. Delyar Corp.,* 457 F.Supp. 1051, 1057 (S.D.N.Y. 1978) (financial experts and geology expert). Generally, paralegals and law clerks rendering services are salaried employees of plaintiffs' counsel. *See, e. g., Baron v. Commercial & Industrial Bank of Memphis, supra; City of New York v. Darling-Delaware, supra* at 1136. Accounting and other experts' services are typically performed by independent sources. *See, e. g., City of New York v. Darling-Delaware, supra* at 1137; *Zipkin v. Genesco, Inc., supra; Levenson v. Overseas Shipholding Group, Inc., supra* at 360–61. Under this authority, if plaintiffs in this action had separately con-

ence before Magistrate Raby, counsel for both parties agreed that at the hearing plaintiffs would introduce the affidavits of those individuals they believed were entitled to bill their time as part of plaintiffs' application for attorneys' fees; defendants had the right to cross-examine those affiants. Plaintiffs' counsel, in a confirming letter to defendants' counsel, listed all of plaintiffs' planned witnesses and inquired whether defendants wanted to add any other affiants; neither Smith nor Ferguson were included in the list. Defendants' counsel never notified plaintiffs that they planned to cross-examine Smith or Ferguson, and therefore, they were not present at the evidentiary hearing. Based on counsels' agreement and defendants' counsels' actions, Magistrate Raby permitted plaintiffs to introduce into evidence Smith's affidavit to support their claim; *see* Tr. 552–56.

**75.** Tr. 212–13.

**76.** Tr. 211–13.

**77.** In *City of New York v. Darling-Delaware, supra,* the court specifically rejected the argument that paralegal expenses were part of the law firm's overhead, and therefore, not billable as a separate expense item:

Plaintiffs' counsel have also applied for reimbursement of expenses and disbursements in the amount of $161,938.72. A substantial portion of this amount is for paralegal expenses. Gemco objects to the award of any expenses for paralegals, claiming that '... use of secretaries and paralegals are plain and ordinary office expenses and reimbursement for the expenses of running a law office comes from the fees earned by the attorneys, not from fees earned by paralegals ... attributable [sic] overhead of paralegals as a billable expense is really pushing a fee application far beyond the limit ....,' Elder Affidavit, ¶ 8. We disagree. Since the use of paralegals has proliferated in the last several years, their use in cases of this nature has been responsible for large savings. It is a practice to be encouraged, and law firms should be reimbursed at least for their expenses (and in appropriate cases perhaps at a greater rate.) *Grinnell I,* 495 F.2d at 473; *Barnett v. Pritzker,* 73 F.R.D. 430, 432 (S.D.N.Y.1977). [footnotes omitted].

*Id.* at 1136.

tracted for data analyst services, then reimbursement for these services could be awarded. As plaintiffs point out, and this Court agrees, denial of reimbursement of the cost of Smith's and Ferguson's services penalizes plaintiffs for their efforts to limit costs by using the services of their data analyst employees, and in effect, encourages attorneys to contract for such services presumably at greater expense.[78] Accordingly, the Court finds that Smith and Ferguson, as data analysts, are within the category of "paraprofessional assistants," and reimbursement of their actual wages for services rendered in this action may properly be included in plaintiffs' costs.[79]

## IV. *Adjustment to the Lodestar*

■ After computing the lodestar figure, the Court may increase or decrease that amount to reflect various subjective factors such as the risk and complexity of the litigation and the quality of the representation. *Cohen v. West Haven Board of Police Commissioners, supra* at 505. Magistrate Raby found (1) that the issues presented were not complex or complicated, (2) that the action was terminated prior to trial and was settled without concession of liability, and (3) that although the municipal defendants pay the award, the taxpayers of the City of Newburgh "will be saddled with the financial burden."[80] For these reasons, the Magistrate recommended that the Court deny plaintiffs their requested fifty percent (50%) increment to the lodestar figure and limit the fee award to the lodestar amount, plus approved disbursements. Both parties object to the Magistrate's recommendation. Defendants argue that the lodestar figure should be decreased for the same reasons set forth by the Magistrate for limiting the award to the lodestar, and because of the professional inexperience of plaintiffs' counsel. Plaintiffs dispute the Magistrate's findings, and assert that the bonus they request should be awarded.

In *City of Detroit v. Grinnell Corp., supra*, 495 F.2d at 471, the Court of Appeals emphasized the importance of the "risk of litigation" factor in deciding whether to adjust the lodestar figure,

> Perhaps the foremost of these factors is the attorney's 'risk of litigation,' *i. e.*, the fact that, despite the most vigorous and competent of efforts, success is never guaranteed. The greater the probability of success, of either ultimate victory on the merits or of settlement, the less this consideration should serve to amplify the basic hourly fee. The tangible factors which comprise the 'risk of litigation' might be determined by asking the following questions: has a relevant government action been instituted or, perhaps, even successfully concluded against the defendant; have related civil actions already been instituted by others; and, are the issues novel and complex or straightforward and well worn? Thus determined, the litigation risk factor might well translate into mathematical terms.

*Id.*

Magistrate Raby found that the issues presented were not complex based on testimony of plaintiffs' attorney Richard Sobol that the case "was not complicated."[81] Indeed, plaintiffs faced limited risks in establishing their claims concerning defendants'

---

**78.** Plaintiffs' Objection to Report of Magistrate, at 10–11.

**79.** The computation by plaintiffs' counsel to determine CDF's actual costs for Smith's and Ferguson's services indicates that Smith's hourly rate of compensation ranged between $20.58 to $24.10 per hour during the years he worked on this matter, and Ferguson's compensation rate was $12.26 per hour. Affidavit of Paul Smith In Support of Plaintiffs' Application for Attorneys' Fees and Expenses, at Attachment A. These hourly rates are equal to or below the reimbursed rates for paralegals and law clerks in fee awards granted by courts in this circuit. *See, e. g., Baron v. Commercial & Industrial Bank of Memphis, supra* ($20 to $40/hour for paralegals and law clerks); *Kane Associates v. Clifford, supra* ($25/hour for paralegals); *Weinberger v. Cook Industries, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 97,978 at 91,034 (S.D. N.Y.1981) ($25/hour for paralegals).

**80.** Magistrate Raby's Report and Recommendation at 26–27.

**81.** *See* Tr. 216.

disciplinary process, specifically their suspension procedures. Although plaintiffs were required to engage in extensive discovery, which was vigorously contested, and statistical analyses to support these claims, plaintiffs' probability of success was greatly increased when this data had been compiled. With respect to the defendants' suspension of students for more than five days, this Court, in granting plaintiffs preliminary injunctive relief, found that "largely undisputed facts establish consistent violations of ... requirements of § 3214 of the New York Education Law ...." [82] Further, this Court found, in approving the proposed settlement of the merits of this action, that plaintiffs' statistical analyses also supported the possibility that minority students attending defendants' schools suffered from a lack of procedural safeguards in a five day or less suspension. [83] Plaintiffs allege they faced some uncertainty in establishing their Title VI claim in that this Circuit has not definitively ruled on whether a showing of intent to discriminate is necessary in all cases brought under the statute. *Compare Bryan v. Koch,* 627 F.2d 612 (2d Cir. 1980) *and Lora v. Board of Education,* 623 F.2d 248, 250 (2d Cir. 1980). The record shows, however, that plaintiffs, in an effort to limit the risks of litigation, pleaded the Title VI claim as an alternative basis for liability. [84]

Although no increase in the lodestar is warranted for the "risk of litigation" factor, other important considerations do support the awarding of an increment. The Court finds that an increase should be awarded for the high quality of plaintiffs' representation by MH and CDF. [85] From the start of this action through the attorneys' fees application, plaintiffs' counsel have displayed a high degree of skill and comprehensive research in their papers. Plaintiffs' counsel sought, and successfully defended on appeal, plaintiffs' preliminary

injunctive relief. In the course of lengthy discovery, plaintiffs successfully sought and obtained, over defendants' legal and factual objections, extensive documents and files to support their claims. Also, despite several unsuccessful attempts to settle, and in the face of a vigorous defense, plaintiffs' counsel negotiated a comprehensive Consent Decree that included most of the relief plaintiffs sought in their amended complaint. Finally, plaintiffs' counsel have convincingly supported and defended their applications for awards of interim and final attorneys' fees. By accepting the prosecution of this action and by displaying a high degree of skill and professionalism, plaintiffs' counsel have brought about the implementation of significant changes in the Newburgh School System that are socially beneficial to all members of that community, particularly its student population.

In determining the amount of the increment to the lodestar, the Court is aware of Magistrate Raby's consideration of the possible "financial burden" on Newburgh's taxpayers. However, several courts have increased the lodestar figure and granted fee awards where the defendants are public officials and/or entities, and the costs would be borne by the taxpayers. *See, e. g., Bolden v. Pennsylvania State Police,* 491 F.Supp. 958 (E.D.Pa.1980); *Keith v. Volpe,* 86 F.R.D. 565 (C.D.Cal.1980); *Vecchione v. Wohlgemuth,* 481 F.Supp. 776 (E.D.Pa. 1979); *Population Services International v. Carey,* 476 F.Supp. 4 (S.D.N.Y.1979); *Aumiller v. University of Delaware,* 455 F.Supp. 676 (D.Del.1978), *aff'd without opinion,* 594 F.2d 854 (3d Cir. 1979); *see generally* Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fees Award Act,* 80 Colum.L.R. 346, 368–69 (1980). Accordingly, the Court finds that defendants' municipal status, without more, should not deny plaintiffs' counsel *any* in-

---

**82.** *Ross v. Disare, supra* at 934.

**83.** *Ross v. Saltmarsh, supra* at 945.

**84.** *See supra* note 39, at 760.

**85.** The Court notes that the skill of the attorneys is *in part* already reflected in the billing rates. *Shapiro v. Consolidated Edison Co. of N.Y., Inc.,* [1978 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 96,364 at 93,252 (S.D.N.Y.1978).

crement to the lodestar; rather, the Court has factored in defendants' status, and the financial implications thereof, in determining the lodestar increment.[86]

Balancing all of the aforementioned factors, and further mindful of the Court of Appeals' admonition that applications for attorneys' fees be scrutinized with an " 'eye to moderation,' seeking to avoid either the reality or the appearance of awarding ' "windfall fees" '," *Beazer v. New York City Transit Authority, supra,* 558 F.2d at 101, the Court awards plaintiffs a twenty-five percent (25%) increment to the lodestar.

## V. *Conclusion*

For the above-mentioned reasons, together with those parts of Magistrate Raby's Report and Recommendation consistent with this Memorandum Opinion, the Court computes plaintiffs' award of attorneys' fees for all of plaintiffs' counsels' services performed in connection with the preliminary injunction, completion of the action and applications for attorneys' fees as follows:

I. <u>Attorneys' Fees for Preliminary Injunction</u>:

| Attorney | Hours Claimed | Travel Time Deduction * | Total Hours Approved | Hourly Rate ** | Reduction for Time Records Reconstruction | Fee Awarded |
|---|---|---|---|---|---|---|
| Goode | 149.25 | (1.5) | 147.75 | $55 | 5% | $ 7,719.94 |
| Witte | 122.00 | (9.0) | 113.00 | $55 | 10% | $ 5,593.50 |
| Crain | 110.50 | (1.5) | 109.00 | $80 | 10% | $ 7,848.00 |
| Golubock | 33.00 | – | 33.00 | $80 | – | $ 2,640.00 |
| Zeisel | 121.25 | (11.5) | 109.75 | $75 | 5% | $ 7,819.69 |
|  | 12.00 | – | 12.00 | $90 | 5% | $ 1,026.00 |
| Sobol | 253.75 | (4.5) | 249.25 | $75 | – | $18,693.75 |
|  | 19.50 | – | 19.50 | $90 | – | $ 1,755.00 |
|  |  |  |  |  |  | $53,095.88 |

II. <u>Attorneys' Fees for Completion of the Action</u>:

| Attorney | Hours Claimed | Travel Time Deduction * | Total Hours Approved | Hourly Rate ** | Reduction for Time Records Reconstruction | Fee Awarded |
|---|---|---|---|---|---|---|
| Daniels | 114.50 | – | 114.50 | $40 | – | $ 4,580.00 |
|  | 363.50 | (2.0) | 301.50 *** | $55 | – | $16,582.50 |
| Torres | 84.68 | – | 84.68 | $40 | 5% | $ 3,217.84 |
|  | 24.15 | (5.18) | 18.97 | $55 | 5% | $ 991.18 |
| Rubin | 13.00 | – | 13.00 | $40 | 5% | $ 494.00 |
|  | 244.62 | (7.0) | 237.62 | $75 | 5% | $16,930.43 |
| Zeisel | 136.97 | (11.0) | 125.97 | $75 | 5% | $ 8,975.36 |
|  | 108.45 | (7.0) | 101.45 | $90 | 5% | $ 8,673.98 |
| Yohalem | 134.00 | (9.75) | 124.25 | $80 | 10% | $ 8,946.00 |
|  | 64.00 | (3.25) | 60.75 | $85 | 10% | $ 4,647.38 |
| Golubock | 750.00 | (22.5) | 727.50 | $80 | – | $58,200.00 |
|  | 158.75 | (7.5) | 151.25 | $85 | – | $12,856.25 |
| Sobol | 56.75 | (3.0) | 53.75 | $80 | – | $ 4,300.00 |
|  | 202.08 | (1.88) | 200.20 | $90 | – | $18,018.00 |

(Evidentiary Hearing Only) ****

\* The Court adopts Magistrate Raby's recommended travel time deductions (<u>see</u> Report and Recommendation at Appendix C); accordingly, the following hours have been deducted from counsels' claimed travel time: Crain (2.63); Witte (12.0); Sobol (9.38); Goode (6.25); Zeisel (29.5); Torres (5.18); Golubock (30.0); Yohalem (13.0); Daniels (2.0); Rubin (7.0).

\*\* The Court adopts Magistrate Raby's recommended hourly rates for counsel, except for attorney Sobol's rates which have been adjusted in accordance with the Court's findings.

\*\*\* The Court, in accordance with its findings, has deducted sixty hours from the post-admission time charges of attorney Daniels.

\*\*\*\* The Court has included in the calculations set forth in "II. Attorneys' Fees for Completion of the Action" the fees awarded attorneys Daniels, Torres, Rubin, Zeisel, Yohalem, Golubock and Sobol in connection with the evidentiary hearing.

**86.** *See* Magistrate Raby's Report and Recommendation at 27 n.24.

II. Attorney's Fees for Completion of the Action:

| Attorney | Hours Claimed | Travel Time Deduction * | Total Hours Approved | Hourly Rate ** | Reduction for Time Records Reconstruction | Fee Awarded |
|---|---|---|---|---|---|---|
| Crain | 8.75 | (1.13) | 7.62 | $80 | – | $ 609.60 |
| Goode | 15.25 | (4.75) | 10.50 | $55 | – | $ 577.50 |
| Witte | 11.50 | (3.0) | 8.50 | $55 | – | $ 467.50 |
| | | | | | | $169,067.52 |

Total Attorneys' Lodestar Fees – $222,163.40

Lodestar "Bonus" Increase(25%) – $ 55,540.85

Total Attorneys' Fees Awarded – $277,704.25

Reimbursement for Expenses – $ 44,150.00 *****

***** The Court, in accordance with its findings, has included in expenses plaintiffs' actual costs for data analysts Paul Smith and Shannon Ferguson.

Accordingly, the Court awards plaintiffs attorneys' fees of $277,704.25 and $44,150.00 for reimbursement of expenses.

It Is So Ordered.