**J. C. FAIRLEY et al., etc., Plaintiffs-Appellants-Cross Appellees,**

**v.**

**Joe T. PATTERSON, Attorney General of the State of Mississippi, et al., etc., Defendants-Appellees,**

**Olyer Blackwell, etc., Intervenor-Appellant,**

**W. U. (Bill) Sigler et al., etc., Defendants-Appellees-Cross Appellants.**

**No. 73-1566.**

United States Court of Appeals, Fifth Circuit.

May 1, 1974.

Constance Iona Slaughter, Forest, Miss., Frank R. Parker, George Peach Taylor, Herman Wilson, Jackson, Miss., Edward J. Currie, Jr., Hattiesburg, Miss., for plaintiffs-appellants.

John G. Kester, Washington, D. C., for intervenor-appellant.

A. F. Summer, Atty. Gen. of Miss., William A. Allain, Asst. Atty. Gen., Jackson, Miss., for State of Miss.

Stone D. Barefield, R. W. Heidelberg, D. Gary Sutherland, James F. McKenzie, Hattiesburg, Miss., for Bd. of Supervisors.

Before TUTTLE, DYER and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge:

This appeal is the consolidation of two suits from the district court, the first involving reapportionment and the second a request for attorneys' fees and expenses in the first. The reapportionment suit is brought under the fourteenth and twenty-sixth amendments to the United States Constitution challenging the district court's approval of the exclusion by county officials of a "class" of college students from the reapportionment of Forrest County, Mississippi. In the second, error is charged the district court by the appellees in the granting of

attorneys' fees and by the appellants in the limiting of the award of attorneys' fees and the denial of costs.

## FACTS

This suit was filed on July 12, 1967, as a complaint under the Voting Rights Act of 1965, 42 U.S.C.A. § 1973 et seq., and the fourteenth and fifteenth amendments to the United States Constitution. The plaintiffs, representing the class of all qualified voters of Forrest County, Mississippi, sued the defendant state officials to enjoin the implementation and enforcement of an amendment to section 2870 of the Mississippi Code permitting the five members of the Forrest County Board of Supervisors to be elected *at-large* rather than from single voting districts.

The Supreme Court reversed the judgment of a three-judge district court, which had dismissed the complaint, holding that section 5 of the Voting Rights Act, 42 U.S.C.A. § 1973c, applied. Allen v. State Board of Elections, 393 U.S. 544, 89 S.Ct. 817, 22 L.Ed.2d 1 (1969), rev'g., Fairley v. Patterson, 282 F.Supp. 164 (S.D.Miss.1967). On remand, the district court entered a temporary restraining order prohibiting section 2870 of the Mississippi Code from being implemented until the state officials had complied with section 5 of the Voting Rights Act.[1]

The election for the Board of Supervisors of Forrest County was thereafter conducted, using the former single district balloting. The five single districts, however, had populations varying from approximately 1,074 to 26,992. The Board of Supervisors recognized in 1969 the need to redistrict the county to conform with constitutional requirements and hired an organization known as Comprehensive Planners, Inc. (CPI) to draw up a redistricting plan. Although CPI submitted several plans, no action was taken.

On December 29, 1971, Olyer Blackwell moved to intervene as a plaintiff and member of the original plaintiffs' class and filed a complaint challenging under the fourteenth amendment the apportionment of the county's voting districts pursuant to section 2870 of the Mississippi Code. The district court subsequently granted Blackwell leave to intervene, held that the apportionment of Forrest County violated the one man, one vote requirement of the fourteenth amendment, and ordered the Board of Supervisors to submit a constitutional reapportionment plan and conduct registration of voters within the new voting districts of the county.

After the initial hearing on the intervenor's complaint, the record reflects that the intervenor took a passive role in the further proceedings. When the defendants-supervisors were tardy in coming forward with a reapportionment design, the district court invited the original plaintiffs to submit a plan.[2]

1. The amendment was submitted thereafter to the Attorney General of the United States who objected to it by a letter dated May 21, 1969.

2. The court addressed a letter to the parties stating:
"United States District Court Southern District of Mississippi April 24, 1972 Mr. Rowland W. Heidelberg, Jr. Attorney 301 West Pine Street Hattiesburg, Mississippi Dear Mr. Heidelberg: Re: *Redistricting Forrest County* I have had no delay whatever in securing census information on telephone request locally. It appears to me that the county is not disposed to redistrict the county even under orders of the Court, and I am inclined to put the necessary pressure there to bring about compliance with the orders of this Court. I know that a further extension has been granted the county and I am just as sure that it will not be redistricted within the allotted time. I am strongly of the persuation that Mr. Taylor and his group should be allowed to furnish the Court with a redistricting plan within the allotted time which does not result in any gerrymandering. Such a plan is now invited, and I will act thereon accordingly for the reason that I am not disposed to further temporize with this matter. With kindest regards to each of you, I am Very sincerely yours, /s/ Harold Cox WHC:afc cc: Mr. Edward J. Currie, Jr. Mr. Stone Barefield Mr. George Peach Taylor."

Subsequently, the Board of Supervisors also presented a plan which was acceptable to the intervenor and the district court. However, the proposal prepared by CPI and submitted to the court by the Board of Supervisors, was not acceptable to the original plaintiffs.[3] In order to achieve population equality between voting districts, CPI utilized final population figures from the 1970 Decennial Census, obtained from the Bureau of the Census, United States Department of Commerce. CPI, however, also consulted the records of the University of Southern Mississippi and William Carey College, both college level institutions in Forrest County. Based solely on these records, CPI subtracted from the census population figures all students at the two colleges who (1) were unmarried, (2) lived on the campus in dormitories or fraternity houses, and (3) were shown on the spring 1970 college records to have an address outside Forrest County. This class of students totalled 3,077 persons, and they were totally omitted from the reapportionment calculations.[4]

### FORREST COUNTY VOTING DISTRICTS

| District | Population By Census | Population Excluding Students |
|---|---|---|
| 1 | 10,995 | — |
| 2 | 10,880 | — |
| 3 | 10,885 | — |
| 4 | 11,449 | 10,961 * |
| 5 | 13,740 | 11,051 ** |

* Excludes 388 students of William Carey College.

** Excludes 2,689 students of the University of Southern Mississippi.

The population variance between the smallest and the largest districts is 25.-5% if this class of students is included;

3. The original plaintiffs' reapportionment scheme was not considered by the court because the plan was filed only in the office of the Clerk of the United States District Court and not with the office of the Chancery Clerk of Forrest County. The district court held, that no opportunity was afforded

without this class of students, the variance is 1.6%.

When the original plaintiffs objected to the exclusion of this class of students, the district court stated:

"The home addresses of these students were obtained by the college officials from the registration cards filed by the students themselves with the college officials for the spring quarter of 1970 and constituted an expression from each of said students as to his permanent residence at that time. All of the students so excluded were nonresidents of Forrest County and were only transient, short-term or temporary inhabitants of the county. The inclusion of these nonresidents on-campus dormitory and fraternity house students, most of whom were concentrated in district no. 5, would distort the equalization of population required by the 'one man, one vote' rule and would have the effect of granting to the permanent residents of those districts greater voting power than other citizens of Forrest County.

"All students residing in dormitory and fraternity houses whose college record indicated permanent home addresses within Forrest County were included in the total population count and allocated to the respective districts where their home addresses were located.

"Inclusion of other students residing off campus and throughout the City of Hattiesburg and Forrest County would not distort the 'one man, one vote' rule. These students are scattered over a much wider geographical area so that inclusion or exclusion would have little or no bearing on equalization of population among the various districts."

The appellants, who only include the original plaintiffs because the interve-

the public to examine, object, or be heard on the plaintiffs' suggested plan and therefore it was not before the court.

4. An additional 125 unmarried students, who lived on campus and whose college records listed home addresses for them in Forrest County, were counted at those addresses.

nor did not object to the county's plan, find fault with these findings on three grounds. First, appellants argue that the exclusion of this class of students creates a variance in excess of that allowed under the fourteenth amendment one man, one vote standards. Without sufficient verification that this class of students' residence lies outside the county, appellants insist that the pure census figures must be used in calculating the population equality between districts. Second, under a traditional equal protection syllogism, appellants assert that this class of students was unreasonably classified as non-residents in violation of the fourteenth amendment. Under this theory, if the students choose to exercise their franchise in Forrest County, their vote will be diluted by the unequal size of voting districts. Lastly, appellants postulate that the exclusion discriminates against a class predominantly eighteen to twenty year olds and therefore violates the twenty-sixth amendment.

## STANDING

As an initial argument on appeal which was not raised in the district court, appellees charged the appellants and their class with lack of standing. If true, this Court would have no jurisdiction, U.S.Const. art. III, § 2, and would be cause for dismissal, Fed.R.Civ.P. 12(h)(3).

Plaintiffs set out the class they represent in their amended complaint:

"3. Plaintiffs are all adult negro citizens of Mississippi and of the United States, and are citizens, residents and qualified electors of Forrest County, Mississippi.

"4. Plaintiffs bring this action on behalf of themselves and all other persons similarly situated as qualified electors of Forrest County and as potential candidates for Board of Supervisors of Forrest County, pursuant to Rule 23 of the Federal Rules of Civil Procedure . . . ."

The intervenor in his "Motion to Intervene as Plaintiff" characterized himself as "a member of the class set forth in *Paragraph No. 4* [set out above] of the original complaint on file herein and is a *qualified elector* of Forrest County, Mississippi, and of *Supervisor District No. 2* of said County. . . ." (Emphasis added).

The Supreme Court in defining the parameters of standing in United States v. S. C. R. A. P., 412 U.S. 669, 689–690, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973), pointed to two indicia of standing: (1) As "injury in fact" and (2) That the injury not be so attenuated as to be imaginary.[5] *Id.* at 688–689, n. 14. The issue then becomes whether the original plaintiffs and their class of qualified electors have sustained sufficient injury to satisfy this standing criterion.

█ Under appellants' first claim, a traditional one man, one vote argument, the Supreme Court has conclusively established in Baker v. Carr, 369 U.S. 186, 204–208, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and Reynolds v. Sims, 377 U.S. 533, 554–561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), that sufficient damage through underrepresentation to obtain standing will be inflicted if population equality among voting units is not present.[6] However, injury results only to those persons domiciled in the *underrepresented* voting districts. Skolnick v. Board of Commissioners of Cook County, 435 F.2d 361 (7th Cir. 1970).

█ Under the prior malapportioned scheme of Forrest County, the electors of Supervisory Districts Nos. 1, 2,

---

5. *See* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) ; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L. Ed.2d 192 (1970) ; Data Processing Service v. Camp, 397 U.S. 150, 151–156, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970) ; Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968).

6. United States v. S.C.R.A.P., *supra*, 412 U.S. at 689 n. 14.

and 3 were underrepresented.[7] The *intervenor*, therefore, as a resident of district no. 2 had standing to bring the initial reapportionment challenge. *Cf.* Skolnick v. Board of Commissioners of Cook County, *supra*, 435 F.2d 361. The original plaintiffs, however, did not allege the voting district in which they reside or that they were underrepresented. Admittedly, part of the class of qualified electors resided in underrepresented districts, but the original plaintiffs cannot properly represent a sub-class of electors of which they may not be members.[8] Mintz v. Mathers Fund, Inc., 463 F.2d 495, 498–499 (7th Cir. 1972); Norman v. Connecticut State Board of Parole, 458 F.2d 497 (2d Cir. 1972); Hamer v. Campbell, 358 F.2d 215, 219 (5th Cir.), cert. denied, 385 U.S. 851, 87 S.Ct. 76, 17 L.Ed.2d 79 (1966); Wilson v. Kelley, 294 F.Supp. 1005, 1010–1011 (N.D.Ga.1968) (three-judge court), aff'd., 393 U.S. 266, 89 S.Ct. 477, 21 L.Ed.2d 425 (1968); 3B Moore's Federal Practice ¶ 23.04. *Cf.* Bailey v. Patterson, 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962). Since the original plaintiffs did not allege residence in district one, two, or three and since they are not proper class representatives of the electors in these districts, there is lack of standing.[9]

In sum, the intervenor had standing to attack the original malapportioned districts. This attack, then joined in by the plaintiffs' counsel through the hearing and order of the trial court, was properly within that court's jurisdiction. However, when the intervenor acquiesced in that judgment, this left only the original plaintiffs. For the reasons already stated, the original plaintiffs were not aggrieved parties, and thus they have no standing to prosecute the appeal.

■ The standing challenge also undermines appellants' two other legal theories, a traditional equal protection rationale and a twenty-sixth amendment claim. The legal rights under these theories may be asserted only by this group of excluded students. Neither the plaintiffs nor the intervenor alleged or demonstrated that the class of qualified electors contains, as a member, any of the omitted students. Therefore, since it must be assumed that none of the injured students are among the plaintiffs or their class and since the original plaintiffs, themselves, lack standing, there is no standing to assert those rights. *See* Socialist Labor Party v. Gilligan, 406 U.S. 583, 92 S.Ct. 1716, 32 L.Ed.2d 317 (1972); Tileston v. Ullman, 318 U.S. 44, 63 S.Ct. 493, 87 L.Ed. 603 (1943).

## ATTORNEYS' FEES AND EXPENSES

■ While the Court has no jurisdiction to hear the appeal in the reapportionment suit, the appellees have cross-appealed in the second case, denying that it was proper for the district court to grant attorneys' fees to the original plaintiffs. Initially, it should be pointed out that to reverse the court's granting of attorneys' fees summarily, on the basis of our finding of lack of standing, would be to ignore the reality of this litigation.

In the first place, the original plaintiffs had standing to bring the original suit, which the Supreme Court ultimately decided in their favor. This suit was then the vehicle upon which intervenor travelled in attacking the malapportion-

7. The population of the voting districts, as malapportioned, totalled:

| District 1 | 26,992 |
| District 2 | 9,761 |
| District 3 | 17,572 |
| District 4 | 1,820 |
| District 5 | 1,704 |

8. The original plaintiffs allege that they represent the class of all qualified electors. This class is clearly not proper under Fed.R.Civ.P. 23(a)(3) and (4) because included are both electors in districts who are benefited by the reapportionment plan, and those in districts prejudiced by underrepresentation. 3B Moore's Federal Practice ¶ 23.07.

9. *See* Skolnick v. Board of Commissioners of Cook County, *supra*, 435 F.2d 361. *See* the cases cited in note 4, *supra*.

ed districts. Moreover, without any challenge being made as to standing in the district court, plaintiffs' counsel carried the laboring oar as stated by the trial court, in bringing the litigation to an end. The court relied directly on the original plaintiffs by inviting a reapportionment proposal from them when the Board of Supervisors actions were inadequate. Later, proceedings were conducted in the adversary mode with the original plaintiffs bearing the burden of challenging the county's reapportionment plan. For this service, the court saw fit to compensate the original plaintiffs. Our finding on the issue of standing cannot undo this service to the court and to the public.

█ The rule on the allowance of attorneys' fees is settled that an award may be made in the exercise of the equity powers of the court. *E. g.,* Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); Ojeda v. Hackney, 452 F.2d 947, 948 (5th Cir. 1972); Lee v. Southern Home Sites Corp., 444 F.2d 143, 144 (5th Cir. 1972); La Raza Unida v. Volpe, 57 F. R.D. 94 (N.D.Calif.1972); 6 Moore's Federal Practice ¶ 54.77 [2].

In resolving the motion for attorneys' fees and expenses by the original plaintiffs, the district court stated:

"It cannot be justly and properly said with any degree of accuracy that Forrest County has been guilty of any conduct which would justify the Court in awarding attorney's fees or such expenses under the circumstances here.

\*   \*   \*   \*   \*   \*

". . . In view of the agreed award of an attorneys' fee to the intervenor, however, it would appear equitable and proper to allow the mov-

ants a like amount for a much greater service rendered the Court in this case. Accordingly, the Court will award the movants $1,500 for their service in this case in spite of the circumstances mentioned, and will deny the expense claim in its entirety."

The "circumstances" referred to by the district court were explained:

". . . The movants, represented by George Peach Taylor, are employed and paid for their services by a tax free national foundation which employs attorneys to engage in such civil rights activities of public interest and importance, and furnishes all necessary revenues therefor. George Peach Taylor has been paid his regular salary and is not due anything for this service he rendered, but any award by the Court for this service will inure in its entirety to the tax free foundation engaged in such business at Jackson as a non-profit operation. There is no question but that such services of the movant were very helpful and beneficial to the Court in bringing such plan to fruition.

\*   \*   \*   \*   \*   \*

". . . Effectively, this motion under the circumstances must be regarded as that of the Ford Foundation. . . . Any award made pursuant to such motion will be directly chanelled into the coffers of the Ford Foundation which enjoys its own reward at public expense by its tax exemption status."

█ The formulations of when a court should exercise its discretion to grant attorneys' fees have been framed within several rationales,[10] two of which support the district court's award in this case.

---

10. The three principle rationales for allowing attorneys' fees have been, (1) "unreasonably and obdurately obstinate" behavior, (2) private attorney general theory, and (3) the common fund situation. *See* La Raza Unida v. Volpe, *supra,* 57 F.R.D. 94; Bradley v. School Board of the City of Richmond, Va., 53 F.R.D. 28 (E.D.Va.1971); Nussbaum, At-

torneys' Fees and Public Interest Litigation, 48 N.Y.U.L.Rev. 301 (1973). *Cf.* Mills v. Electric Auto-Lite Company, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968); Lee v. Southern Home Sites Corp., *supra,* 444 F.2d 143.

The first ground is satisfaction of the "unreasonably and obdurately obstinate" behavior standard. When a party's conduct has been vexatious, groundless, or in bad faith, courts have charged attorneys' fees and costs against the adverse party. Kahan v. Rosenstiel, 424 F.2d 161, 167, nn. 6 & 7 (3rd Cir. 1970), cert. denied, 398 U.S. 950, 90 S.Ct. 1870, 26 L.Ed.2d 290 (1970); Bradley v. School Board of the City of Richmond, Va., *supra*, 53 F.R.D. at 38–40. A corollary to this standard has emerged recently, primarily from the school desegregation litigation. When a suit alleging violation of clearly established law in a particular area is filed, and the defendants, in the face of evident violation of this law, persist in forcing the plaintiffs to expend efforts in preparing and/or conducting a trial, then attorneys' fees may appropriately be awarded. Bradley v. School Board of the City of Richmond, Va., *supra*. This factor has been decisive on the issue of attorneys' fees in other reapportionment suits. *See* Sims v. Amos, 340 F.Supp. 691, 694 (M.D.Ala.) (three-judge court), aff'd. per curiam, 409 U.S. 942, 93 S.Ct. 290, 34 L.Ed.2d 215 (1972); Dyer v. Love, 307 F.Supp. 974 (N.D.Miss.1969).

The second supporting rationale, the private attorney general theory, is derived from the Supreme Court opinions in Newman v. Piggie Park Enterprises, Inc., *supra*; and Mills v. Electric Auto-Lite Co., *supra*, 396 U.S. at 389–397. The theory is that private plaintiffs have aided in effectuating important congressional and public policies. Attorneys' fees have not only been granted in suits brought under the Civil Rights Act, 42 U.S.C.A. §§ 1981, 1982, 1983, *e. g.*, Sims v. Amos, *supra* (section 1983); Cooper v. Allen, 467 F.2d 836 (5th Cir. 1972) (section 1981); Lee v. Southern Home Sites Corp., *supra*, 444 F.2d 143 (section 1982); Knight v. Auciello, 453 F.2d 852 (1st Cir. 1972) (section 1982); Jinks v. Mays, 350 F. Supp. 1037 (N.D.Ga.1972) (sections 1981–1983); NAACP v. Allen, 340 F. Supp. 703, 708–710 (M.D.Ala.1972) (section 1983), but also under various other federal statutes, *e. g.*, Yablonski v. United Mine Workers, 151 U.S.App.D.C. 253, 466 F.2d 424 (1972), cert. denied, 412 U.S. 918, 93 S.Ct. 2729, 37 L.Ed.2d 144 (1973) (labor-management recording and disclosure act); La Raza Unida v. Volpe, *supra*, 57 F.R.D. 94 (various federal transportation statutes).

Having affirmed the allowance of attorneys' fees, a second question, of whether the court abused its discretion in limiting the awarded amount and in denying expenses,[11] arises. The court's verbalized reason for denying expenses and limiting attorneys' fees, for the "much greater service" performed by the original plaintiffs than the intervenor, is that the funds would flow into the "coffers of the Ford Foundation."[12] This is an impermissible rationale to use in determining the amount of attorneys' fees and expenses. This Court has indicated on several occasions that allowable fees and expenses may not be reduced because appellants' attorney was employed or funded by a civil rights organization and/or tax exempt foundation or because the attorney does not exact a fee.[13] This Court has, previously, awarded fees to attorneys while em-

---

11. Court costs not subsumed under federal statutory provisions normally granting such costs against the adverse party, Fed.R.Civ. P. 54(d); 6 Moore's Federal Practice ¶ 54.70, 54.71, are to be included in the concept of attorneys' fees. Of course, it may be disputed whether such expenses should have to meet the harder discretionary standards or fall within the statutory authorizations. *See* Sims v. Amos, *supra*, 340 F.Supp. at 695, n. 11.

12. The attorneys for the original plaintiffs are employed by the Lawyers Committee for Civil Rights Under Law. There is no indication in the record that this organization, the attorneys, or the plaintiffs have any association with the Ford Foundation.

13. Miller v. Amusement Enterprises, Inc., 426 F.2d 534, 538–539, n. 14 (5th Cir. 1970); Clark v. American Marine Corp., 320 F.Supp. 709 (E.D.La.1970), aff'd per curiam, 437 F.

ployed by the Lawyers Committee without hinting that their employment status was relevant to this issue. Fears v. Burris Manufacturing Co., 436 F.2d 1357, 1359; 4 E.P.D. ¶ 7535, 7536 (5th Cir. 1971).

■■■ This Court pointed to the essential indicium in Miller v. Amusement Enterprises, Inc., *supra*, 426 F.2d at 538–539:

> "What is required is not an obligation to pay attorneys' fees. Rather what—and all—that is required is the existence of a relationship of attorney and client, a status which exists wholly independently of compensation, as witness of the effective service of counsel in the defense of criminal cases, the assertion of post-conviction habeas remedies and the now widespread organized services on behalf of the poor."

This Court echoed this holding in affirming the district court's award of attorneys' fees in Clark v. American Marine Corp., *supra*, 320 F.Supp. 709. In describing, there, how the amount was to be determined, the court stated: "Whether or not he agreed to pay a fee and in what amount is not decisive. . . . The criterion for the court is not what the parties agreed but what is reasonable." *Id.* at 711. Whether the

attorney charges a fee or has an agreement that the organization that employs him will receive any awarded attorneys' fees are not bases on which to deny or limit attorneys' fees or expenses.[14]

■■■ Appropriate factors which the court may take into consideration, on remand, in determining the amount of the award of attorneys' fees were set out recently by this Court in Johnson v. Georgia Highway Express, 488 F.2d 714 (5th Cir. 1974).[15] Our decision in *Johnson*, however, addressed only attorneys' fees, without touching upon expenses. The large costs of a reapportionment plan is an item of expense unique to this type of suit. In light of the district court's specific invitation [16] for the original plaintiffs to submit a plan, we think it clear that this cost is to be treated as a part of the award, and the court has determined that attorneys' fees are to be allowed.[17] *Cf.* Sims v. Amos, *supra*, 340 F.Supp. at 695, n. 11.

Upon remand the Court should consider what attorneys' fees and costs are appropriate, by applying the standard here set out.

The judgment is affirmed in part and reversed in part and remanded for further proceedings not inconsistent with this opinion.

2d 959 (5th Cir. 1971). *See* Sanders v. Russell, 401 F.2d 241 (5th Cir. 1968). For a similar holding by the Court of Appeals for the Fourth Circuit see Lea v. Cone Mills Corp., 438 F.2d 86, 88, 89–90 (4th Cir. 1971).

While these cases involve statutorily authorized attorneys' fees, there is little difference in the factors which are relevant in determining the amount of the fees and costs, once the court has exercised its discretion to allow them, between statutorily authorized and equity granted attorneys' fees.

14. To hold otherwise might raise other issues of constitutional dimension. *E. g.*, U.S.Const. amend. XIV, Equal Protection Clause; Lefton v. City of Hattiesburg, 333 F.2d 280, 285 (5th Cir. 1964) (" . . . may not be allowed to operate in such a way as to abridge the right of any class of litigants to use the fed-

eral courts or to deny the Sixth Amendment right of criminal defendants to counsel of their own choice.") *See* Sanders v. Russell, *supra*, 401 F.2d 241; Alexander v. Cox, 348 F.2d 894 (5th Cir. 1965).

15. Although that case involved statutorily authorized attorneys' fees, as stated in note 12, *supra*, once the grant has been awarded, the factors relevant to determining the amount are similar in the equity cases.

16. See note 2, *supra*.

17. Costs are usually fixed and certain. In public interest litigation, especially, where an attorney may donate his legal talents, the expenses of preparing and conducting the litigation require direct out-of-pocket expenditures by a party, which should be completely recoverable.