Claud E. BODDIE; and Ajax Morris, Jr. Plaintiffs

v.

CITY OF CLEVELAND, MISSISSIPPI; Cleveland, Mississippi, Democratic Executive Committee; and Cleveland, Mississippi, Election Commission Defendants

No. 4:01 CV 88–D–B.

United States District Court, N.D. Mississippi, Greenville Division.

Jan. 21, 2004.

Ellis Turnage, Cleveland, MS, for Claud E. Boddie, Ajax Morris, Jr., plaintiffs.

William S. Adams, Jr., Jacks, Adams & Norquist, P.A., Cleveland, MS, for Cleveland, Mississippi, Cleveland Mississippi Democratic Executive Committee, Cleveland Mississippi Election Commission, defendants.

## OPINION

DAVIDSON, Chief Judge.

The Plaintiffs, who are registered voters in Cleveland, Mississippi, filed this voting rights action on April 17, 2001, alleging that the existing redistricting plan used by the City of Cleveland to elect aldermen and executive committee members violates both Section 2 of the Voting Rights Act of 1965 (42 U.S.C. § 1973), and the one-person/one-vote principle of the Fourteenth Amendment to the United States Constitution. The court conducted a bench trial of this matter from October 6, 2003, through October 8, 2003.

Having carefully considered the testimony and exhibits presented at trial along with the parties' post-trial submissions, the court finds that the City's existing aldermanic plan has become malapportioned and therefore violates the one-person/one-vote principle of the equal protection clause of the Fourteenth Amendment. The court further finds that the City's use of at-large voting to elect one alderman is permissible, and that the non-resident student population who reside in dormitories at Delta State University should not be included in the apportionment base for the City's aldermanic wards.

Because neither party has submitted an acceptable and precleared redistricting plan to the court, the court herein orders the parties to attempt to reach agreement on a joint proposal in accordance with the court's rulings. In the event that the parties are unable to devise a plan that will comply with the appropriate statutory and constitutional requirements, the court will consider appointing an expert or special master to assist in fashioning a permissible plan that will then be submitted to the Department of Justice for preclearance pursuant to Section 5 of the Voting Rights Act.

Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court issues the following findings of fact and conclusions of law.

## A. Factual Background

The City of Cleveland, Mississippi (the City), is governed by a seven member city council that is elected once every four years from six single-member aldermen districts, with one at-large alderman being elected in citywide voting. In their complaint, the Plaintiffs argue that the City's voting districts, which are based on 1990 census data, have become unconstitutionally malapportioned and impermissibly dilute black voting strength, according to the 2000 census data. More specifically, the Plaintiffs assert the following three claims:

1) that the City's six aldermanic wards have become unconstitutionally malapportioned;

2) that the City's use of at-large voting to elect one alderman is impermissible; and

3) that the inclusion of the non-resident student population residing at Delta State University (DSU) into the apportionment base is impermissible.

According to the 2000 census, the City has a total population of 13,841, of whom 6,679 (48.3%) are African–American and 6,907 (49.9%) are white, with 255 (1.8%) being of other ethnic origins. The voting age population consists of 10,488 adults, of whom 4,569 (43.6%) are African–American and 5,729 (54.6%) are white, with 190 (1.8%) being of other ethnic origins. The City's current voting plan has three majority white districts, in which the African–American population totals 19.95%, 4.74%, and 1.45%, respectively; the other three districts are majority African–American, with the African–American population totaling 76.82%, 90.46%, and 98.01% in those districts.

■ Under the City's current voting plan and the 2000 census data, the maximum population deviation among the City's six aldermanic wards is at least 23.36% and may be as high as 48.7%, depending upon whether DSU's non-resident student population is included or excluded from the apportionment base.[1] Under either scenario, the City's wards are presumptively in violation of the one-person/one-vote principle set forth in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), which requires that voting districts contain roughly equal population. *See Brown v. Thomson*, 462 U.S. 835, 843, 103 S.Ct. 2690, 2696, 77 L.Ed.2d 214 (1983) (holding that population deviations exceeding ten percent are generally unconstitutional unless justified by state or local government).

Here, the City does not dispute that the present voting districts are malapportioned and must be redistricted. Thus, the court must decide the following issues: 1) whether DSU's non-resident student population should be excluded from the apportionment base; 2) whether the City's use of at-large voting to elect one alderman is permissible; and 3) the procedure that should be utilized in fashioning a proper voting plan for the City to use in future elections.

## B. Standard

■ The requirements of the Voting Rights Act of 1965(VRA), 42 U.S.C. §§ 1973–1973bb, are intended to ensure that the quantitatively equal votes of racial and language minorities, protected by the one person/one-vote requirement, are also qualitatively equal. The Act phrases this requirement in terms of the ability of racial or language minorities to have an

---

1. The maximum population deviation is computed by determining the average population of the districts at issue, then totaling the percentages by which the two districts containing either the largest or the smallest population vary from the average. Thus, the percentage computed is the deviation between the most populous and the least populous districts.

equal opportunity "to elect representatives of their choice." 42 U.S.C. § 1973(b).

Section 2(a) of the VRA prohibits any "voting qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Section 2(b) of the VRA provides that a denial or abridgment of the right to vote occurs when,

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

■ The essence of a Section 2 claim is that "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). Section 2 of the VRA is thus violated by vote dilution, which is the practice of reducing the potential effectiveness of a group's voting strength by limiting its opportunity to translate that strength into voting power. *See, e.g., Shaw v. Reno,* 509

U.S. 630, 641, 113 S.Ct. 2816, 2823, 125 L.Ed.2d 511 (1993) (stating that Section 2 prohibits legislation that results in dilution of minority group's voting strength); *Gingles,* 478 U.S. at 46–51, 106 S.Ct. 2752 (explaining basis for claim of vote dilution under Section 2).

In *Gingles,* the Supreme Court set out three necessary preconditions that plaintiffs asserting a vote dilution claim under Section 2 must prove:

1) that the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district;

2) that the minority group is politically cohesive, in the sense that its members vote in a similar fashion; and

3) that the white majority votes as a bloc, thus enabling whites to usually defeat the minority group's preferred candidates at the polls.

*Gingles,* 478 U.S. at 50, 106 S.Ct. 2752. If the plaintiffs satisfy the three *Gingles* preconditions, the district court must then determine whether, under the totality of the circumstances, the plaintiffs have proven the existence of vote dilution under the challenged plan. *Houston v. Lafayette County, Miss.,* 56 F.3d 606, 609–10 (5th Cir.1995). The factors to consider in making this determination include the following:

(1) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(2) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(3) the extent to which the state or political subdivision has used unusually

large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(4) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(5) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(6) whether political campaigns have been characterized by overt or subtle racial appeals; and

(7) the extent to which members of the minority group have been elected to public office in the jurisdiction.

*Gingles,* 478 U.S. at 36–37, 106 S.Ct. 2752. Additional factors that in some cases have had probative value as part of the plaintiffs' evidence to establish a violation are: (i) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group, and (ii) whether the policy underlying the state or political subdivision's use of any voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. *Id.* at 37, 106 S.Ct. 2752.

Finally, there are three limitations placed on the flexible seven-factor test set forth above:

1) electoral devices, such as at-large elections, may not be considered per se violative of Section 2. Instead, the plaintiffs must demonstrate that, under the totality of the circumstances, such devices result in unequal access to the electoral process;

2) the conjunction of an allegedly diluted electoral mechanism and the lack of proportional representation alone does not establish a violation; and

3) the results test does not assume the existence of racial bloc voting; the plaintiffs must prove its existence.

*Gingles,* 478 U.S. at 46, 106 S.Ct. 2752.

## C.  Discussion

As a preliminary matter, the court notes that the Defendants do not dispute the fact that the City's aldermanic wards have become malapportioned and constitutionally impermissible due to population shifts within the City since the 1990 census. The maximum deviation for the City's present wards is 23.36%, far in excess of the 10% threshold established by the Supreme Court in *Brown v. Thomson,* 462 U.S. at 843, 103 S.Ct. 2690. Accordingly, the court finds that a new aldermanic redistricting plan must be established, precleared, and in place before the next scheduled City election in November of 2005. In accordance with the following analysis, the plan shall include six wards and one at-large seat. The population apportionment base for the plan shall exclude all non-resident DSU students who reside in a dormitory on the DSU campus.

### 1.  DSU's Non–Resident Student Population

■ The Plaintiffs assert that the inclusion of the non-resident student population residing at Delta State University (DSU) into the apportionment base is impermissible.

■ States and other political subdivisions are not required to include transients, short-term residents or temporary residents in the apportionment base upon which their voting districts or wards are

based. *Burns v. Richardson*, 384 U.S. 73, 91–92, 86 S.Ct. 1286, 1296–97, 16 L.Ed.2d 376 (1966). In *Fairley v. Patterson*, 493 F.2d 598, 602 (5th Cir.1974), the Fifth Circuit upheld a Forrest County, Mississippi, supervisory redistricting plan which omitted from the reapportionment calculations all non-resident students at the county's two colleges who were unmarried and resided in dormitories or fraternity houses on campus; this totaled some 3,077 students. Non-resident students residing off campus were included in the Forrest County apportionment base; only those residing in dormitories were excluded. *Fairley*, 493 F.2d at 602–603.

In arguing against exclusion of the subject DSU students, the Defendants assert that excluding the students would violate their rights under the equal protection clause and the principle of one person/one vote. This is the same argument raised in *Fairley* on behalf of the Forrest County students who were excluded from the apportionment base. As the Fifth Circuit held in that case, the court here finds that such claims can only be asserted by the students themselves; no other person or entity has standing to assert those rights on behalf of the students. *Fairley*, 493 F.2d at 604; *Socialist Labor Party v. Gilligan*, 406 U.S. 583, 589, 92 S.Ct. 1716, 1720, 32 L.Ed.2d 317 (1972); *Tileston v. Ullman*, 318 U.S. 44, 46, 63 S.Ct. 493, 494, 87 L.Ed. 603 (1943). The Defendants' arguments against exclusion, therefore, are without merit.

Here, some 1,057 non-resident students reside in the 12 student dormitories at DSU. In accordance with the above-cited authorities, these students shall be excluded from the City's apportionment base for its aldermanic wards. Thus, the City's population apportionment base shall consist of 12,784 residents, who shall be apportioned into one of six aldermanic wards.

### 2. At–Large Voting

■ The Plaintiffs also argue that the City's system for electing one alderman in an at-large city-wide election is impermissible.

■ As the United States Supreme Court has made clear, at-large election systems are not necessarily violative of Section 2 of the VRA. *Gingles*, 478 U.S. at 46, 106 S.Ct. 2752; *Jones v. City of Lubbock*, 727 F.2d 364, 376 (5th Cir.1984). In fact, Mississippi law specifically permits municipalities to utilize at-large voting for one alderman, a fact the Plaintiffs admit in their Supplemental Proposed Findings of Fact and Conclusions of Law. *See* Miss. Code Ann. § 3374–36 (1942); Plaintiffs' Supplemental brief at ¶ 2.

In *Stewart v. Waller*, 404 F.Supp. 206, 213–15 (N.D.Miss.1975), a three-judge court declared Miss.Code Ann. § 21–3–7 (1972), the successor enactment to Miss. Code Ann. § 3374–36 (1942), to be unconstitutional and null and void in its entirety. The court further decreed that the statute law of the State of Mississippi as it existed prior to the passage of § 21–3–7 be given full force and effect as if it had never been repealed, effectively reinstating Miss.Code Ann. § 3374–36 (1942). Neither party disputes the holding of *Stewart*, nor its continuing vitality and applicability to the case *sub judice*.

Section 3374–36, which directs that aldermen in certain Mississippi municipalities having a population of over ten thousand (as the City does, even after the non-resident DSU students are excluded) be elected from six single-member districts and one at-large district, states in its entirety that:

> In all municipalities operating under a code charter and having a population of less than ten thousand, according to the last available federal census, there shall

be five aldermen, which aldermen may be elected from the municipality at large, or in the discretion of the municipal authorities, the municipality may be divided into four wards, with one alderman to be elected from each ward and one from the municipality at large. In all such municipalities having a population of ten thousand, or more, according to the last available federal census, there shall be seven aldermen, and the municipality shall be divided into six wards with one alderman to be elected from each ward and one from the municipality at large.

Miss.Code Ann. § 3374–36 (1942). It is undisputed that the City operates under a code charter and is thus subject to the provisions of Section 3374–36.

In the case *sub judice,* the Plaintiffs have failed to proffer sufficient evidence for the court to find that the City's at-large election plan is impermissible. In addition to the above-cited authority, their claim also fails because of their inability to satisfy *Gingles'* third precondition—that white bloc voting in the City enables whites to usually defeat the minority group's preferred candidates. *See Gingles,* 478 U.S. at 48–49, 106 S.Ct. 2752.

In support of their argument, the Plaintiffs point to three City-wide elections where the minority candidate was defeated by the incumbent white candidate.[2] The Defendants do not dispute the utilization of these three elections, nor do they dispute that some level of racial bloc voting occurred. They do contend, however, and the court agrees, that the three subject minority candidates were not defeated by

white bloc voting. Instead, the minority candidates failed to garner large amounts of support even in the City's majority-minority wards; the three candidates all also faced the uphill challenge of unseating popular incumbent officeholders.

In each of these elections, the white candidates did receive the majority of the votes cast in the City's three majority white wards. The white candidates also, however, received significant support in the City's three majority-minority wards. In the 2001 mayoral election, the white candidate received an average of 22.84% of the votes cast in the three majority-minority wards: he received 29.56% of the vote in Ward 1, 24.68% in Ward 2, and 14.29% in Ward 6. One of the Plaintiffs himself, Ajax Morris, testified at the trial of this cause that the minority candidate in that election, Cynthia Blockett, "didn't receive that many votes on the African–American side."

The results are even more dramatic in the 1993 at-large alderman election, where the white candidate received an average of 40.6% of the vote in the City's three majority-minority wards—51.7% of the vote in Ward 1, 39.12% in Ward 2, and 30.99% in Ward 6. In the 1981 race, the white candidate received 73% of the city-wide vote, including a measure of support in the majority-minority wards.

These numbers illustrate that the minority candidates lost not only due to any white bloc voting that may have taken place, but also because they failed to receive sufficient support in the majority-minority wards. And, as stated in *Gingles,* a vote dilution claim based on an at-

---

**2.** The three subject elections are (1) the June 2001 City mayoral race in which the African–American candidate, Cynthia Blockett, was defeated by the incumbent white mayor, Martin King; (2) the May 1993 at-large alderman race in which the African–American candi-

date, Ellis Turnage, was defeated by the incumbent white alderman, David Work; and (3) the 1981 at-large alderman race in which the African–American candidate, Walter Scott, was defeated by the incumbent white alderman, Louis Kaplan.

large voting plan is found only "where minority and majority voters consistently prefer different candidates [and] the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." *Gingles,* 478 U.S. at 48, 106 S.Ct. 2752. The Plaintiffs have simply failed to establish this fact in the case *sub judice.*

In addition, while the three minority candidates in the above-denoted races lost, the record demonstrates that African–American candidates in many other City and county wide elections have prevailed. Three of the City's current aldermen, two of the at-large members on the City School Board, the Superintendent of the School Board, the Circuit Clerk, a Circuit Court Judge, a County Court Judge, and a majority of the County Election Commission are African–American, thus demonstrating that minority candidates are fully capable of winning City and county-wide elections, and that the City's minority citizens can fully participate in the political process.

In sum, the court finds that the Plaintiffs have failed to establish the third *Gingles* precondition—that white bloc voting in the City enables whites to usually defeat the minority group's preferred candidates. Accordingly, the Plaintiffs cannot state a claim for a Section 2 violation concerning the City's use of one at-large alderman seat.

For all of the above-stated reasons, the court holds that the City's use of at-large voting to elect one alderman is permissible and shall be continued.

### 3. Procedure for Fashioning an Acceptable Plan

■ The parties do not dispute that, since November 1, 1964, the State of Mississippi and all of its political subdivisions, including the City, have been covered by the VRA.[3] Thus, the City's redistricting plan must be submitted to the Department of Justice for preclearance in accordance with Section 5 of the VRA prior to implementation. *United States v. Board of Supervisors of Warren County, Miss.,* 429 U.S. 642, 644, 97 S.Ct. 833, 834, 51 L.Ed.2d 106 (1977). Obviously, this court may not make a judicial determination that a plan which has not been given Section 5 preclearance is valid under Section 2; jurisdiction to make such a judicial determination is vested solely in the District Court for the District of Columbia by the express provision of Section 5. *Warren County,* 429 U.S. at 644–45, 97 S.Ct. 833. Once a plan has been precleared pursuant to Section 5, however, such preclearance is no impediment to the imposition of proceedings in this court in order to challenge the plan under Section 2. *See, e.g., Gunn v. Chickasaw County, Miss.,* 705 F.Supp. 315, 321 (N.D.Miss.1989).

In light of the fact that the Defendants have not submitted a plan, and that the

---

**3.** Section 5 of the VRA requires, in relevant part, that whenever a State or political subdivision covered by the Act seeks to administer "any voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting different from that in force or effect on November 1, 1964," it may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that "such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to

vote on account of race or color." Until the District of Columbia court enters a declaratory judgment to that effect, no person may be denied the right to vote for failure to comply with the new practice or procedure. As an alternative to the requirement of a declaratory judgment, Section 5 permits the State or political subdivision to enforce a new voting procedure if the procedure has been first submitted to the Attorney General of the United States and the Attorney General has not, within 60 days, interposed an objection to the proposed change. *See* 42 U.S.C. § 1973c.

Plaintiffs' two alternative non-precleared proposed plans do not comply with the foregoing rulings of the court, the court hereby instructs the parties to attempt to reach agreement on a joint proposal, bearing in mind the rulings of the court concerning the at-large seat and the DSU student population. In the event that the parties are unable to agree on a plan by July 5, 2004, the court shall consider appointing a special master to assist in fashioning an appropriate plan.

### D. Conclusion

In line with the above-cited authorities, the court finds that the Defendant City of Cleveland's existing aldermanic plan has become malapportioned and therefore violates the one-person/one-vote principle set forth in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The court further finds that the City's use of at-large voting to elect one alderman is permissible and shall be continued, and that the non-resident student population that resides in one of the dormitories at Delta State University should not be included in the apportionment base for the City's aldermanic wards.

Because neither party has yet submitted an acceptable redistricting plan to the court, the court herein orders the parties to attempt to reach agreement on a joint proposal in accordance with the court's rulings. In the event that the parties are unable to devise a plan that will comply with the appropriate statutory and constitutional requirements by July 5, 2004, the court will consider appointing an expert or special master to assist in fashioning a permissible plan that will be submitted to the Department of Justice for preclearance pursuant to Section 5 of the VRA.