DENNIS, Circuit Judge,
concurring in part and dissenting in part.
I CONCUR in the majority opinion’s treatment of the one person, one vote claim in this ease. However, because I believe that the district court did not make sufficiently detailed findings of fact in support of its grant of summary judgment to the City of Hattiesburg on the first Cin-gles factor to enable us to conduct a thorough analysis under the Voting Rights Act, 42 U.S.C. § 1973(a), and because I disagree with some of the statements made by the majority in its unnecessary discussion of the totality of the circumstances test, I respectfully DISSENT from its holding on the Voting Rights Act claim. I address these two separate concerns in turn.

I. dngles

As the majority opinion correctly notes, the first angles factor requires a VRA plaintiff to prove that the minority group in question “is sufficiently large and geo *676 graphically compact to constitute a majority in a single-member district.” Clark v. Calhoun County, 21 F.3d 92, 94 (5th Cir.1994) (citing Thornburg v. Gingles, 478 U.S. 30, 48-51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986)). The majority opinion, however, states that “plaintiffs typically have been required to propose hypothetical redistricting schemes and present them to the district court in the form of illustrative plans,” and cites to a footnote in Magnolia Bar Ass’n Inc. v. Lee, 994 F.2d 1143, 1151 n. 6 (5th Cir.1993) for this claim. The footnote in question notes that the first Gingles precondition “specifically contemplates the creation of hypothetical districts,” but does not discuss any requirement of illustrative plans. Although illustrative plans may be a common approach taken by plaintiffs in Voting Rights Act cases — and are certainly a helpful method of providing evidence to be considered under the first Gingles factor — I do not read our case law to require such an approach.
In any event, however, the plaintiffs in this case presented an illustrative redistricting plan that likely showed that the African-American population in Hatties-burg is “sufficiently large and geographically compact to constitute a majority in a single-member district,” Clark, 21 F.3d at 94. It is impossible for this court to be certain, however, because the district court did not make sufficiently detailed fact-findings to enable us to conduct a proper review.
The majority opinion bases its holding on the first Gingles factor primarily on the fact that the plaintiffs did not present any method by which they proposed to ascertain which students living in the dormitories were in fact residents entitled to vote; according to the majority, since the exclusion of such students in a blanket dormitory-student exclusion would be illegal, the plan therefore failed. Maj. op. at 670-71. The majority acknowledges that our case law holds that a proposed redistricting plan need not be presented in court in a form that would be ready to be implemented immediately: “A plaintiffs proposed district is not east in stone. It [is] simply presented to demonstrate that a majority-black district is feasible [in a given municipality], If a § 2 violation is found, the [municipality] will be given the first opportunity to develop a remedial plan.” Clark, 21 F.3d at 95 (citing Westwego Citizens for Better Gov’t v. City of Westwego (Westwego III), 946 F.2d 1109, 1124 (5th Cir.1991)). According to the majority, however, the failure to identify a method of ascertaining which students are entitled to vote is fatal to the plan. This narrow approach is at odds not only with the language of Clark and Westwego III, but also with the evidence presented. There was testimony at trial that at least 570 of the dormitory students were registered to vote. Clearly, there is in fact some way of discovering how many dormitory students are registered to vote or entitled to register to vote, and the parties have done so to some extent already. The district court’s eon-clusory finding that there is “no rehable way” of discovering this number provides no details or analysis for this court to review.
Our case law is clear that Voting Rights Act cases require a heightened level of detail in district court factual findings: “We have stressed repeatedly the special need for detailed findings of fact in vote dilution cases: ... ‘Perhaps in no other area of the law is as much specificity in reasoning and fact finding required, as shown by our frequent remands of voting dilution cases to district courts.’ ” Westwego Citizens for Better Gov’t v. City of Westwego (Westwego II), 872 F.2d 1201, 1203 (5th Cir.1989) (quoting Velasquez v. City of Abilene, 725 F.2d 1017, 1020 (5th *677 Cir.1984)); see also Teague v. Attala County, 17 F.3d 796, 798 (5th Cir.1994) (“This court is unable to discharge our appellate function in voting rights cases without more guidance by the trial court concerning its credibility choices on the welter of evidence before it.”). The district court’s lack of factual findings may be traced to a mistaken understanding of the law not addressed by the majority opinion: namely, the district court appeared to assume that the plaintiffs would have had to prove that the City was already legally required to take the action proposed by their illustrative plan in order to prevail. No law supports such an assumption.[1]
This erroneous assumption by the district court (unsurprisingly provided with no citations to case law, since there is none that supports it) prevented it from making any additional factual findings as to the details of the plaintiffs’ illustrative redistricting plan beyond the conclusory statement discussed above. I would therefore not affirm the district court’s judgment in this respect, but would vacate and remand the case to that court for further fact-finding as to the feasibility of the plaintiffs’ illustrative redistricting plan.[2]

II. Totality of the Circumstances

After disposing of the case based on the first Gingles factor, the majority opinion goes on to affirm the district court’s further finding that even if the plaintiffs had satisfied the angles preconditions they would not have satisfied the totality of the circumstances test that follows. The majority opinion’s discussion of the case law surrounding the totality of the circumstances test is at times confused and therefore misleading. Since I believe the district court did not make sufficient factual findings to enable our review of the first angles factor, I express no opinion on whether the plaintiffs would have prevailed under the totality of the circumstances test, but I write to note my disagreement with the majority’s interpretation of the controlling law.
The majority opinion begins its analysis of the totality of the circumstances test by characterizing the plaintiffs’ objections to the use of Census data (as opposed to *678 registered voter data) for the apportionment base as being only “generalized suspicions” about the Census. In fact, the plaintiffs provided both scholarly authority supporting the idea that the Census generally undercounts African-Americans, particularly African-American adult men, see Mary Mulry, Statistical Research Division, U.S. Census Bureau, Summary of Accuracy and Coverage Evaluation for 2000 Census 13, 15 (Feb. 28, 2006), and explained specifically that the Census data was inaccurate because it included temporary residents not entitled to vote in Hattiesburg, and because in a city with a large transient population (like a university or a military base), such figures are less reliable than registered voter figures, see, e.g., Gaffney v. Cummings, 412 U.S. 735, 746-47, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973) (“[Census figures] tell us nothing of the other ineligibles making up the substantially equal census populations among election districts: aliens, nonresident military personnel, nonresident students, for example.”).
The majority opinion goes on to express skepticism about the use of voter registration figures in Voting Rights Act cases, particularly for the proportionality analysis that makes up part of the totality of the circumstances test. This skepticism is unwarranted. The Supreme Court has always declined to choose a particular set of figures that are to be considered in determining proportionality under the Voting Rights Act (e.g., total population, voting-age population, or registered voters). See, e.g., De Grandy v. Johnson, 512 U.S. 997, 1017 n. 14, 114 S.Ct. 2647, 129 L.Ed.2d 775 (“The parties dispute whether the relevant figure is the minority group’s share of the population, or of some subset of the population, such as those who are eligible to vote, in that they are United States citizens, over 18 years of age, and not registered at another address (as students and members of the military often are). Because we do not elevate this proportion to the status of a magic parameter, and because it is not dispositive here, we do not resolve that dispute.”).[3] Voting-age population may indeed be the most common metric, but in a situation like the one at issue here, where a city has a large population of non-resident university students *679 who will likely almost all be both of voting age and included in the Census figures, the use of voter registration data may in fact be preferable. While, again, I express no opinion about the data in this case, due to the district court’s lack of detailed factual findings sufficient to enable review, I disagree with the majority that the case law supports strongly disfavoring any particular set of figures under the Voting Rights Act, including voter registration figures, when the Supreme Court has expressly declined to do so because of the nuances present in each individual case. I therefore respectfully DISSENT from the Voting Rights Act holdings in the majority opinion.

. The majority opinion compounds this error to some extent when it finds that “no authority” supports the exclusion of the dormitory students in the plaintiffs’ illustrative redistricting plan. Maj. op. at 672. The majority opinion seems to be characterizing the plaintiffs' plan as being a plan to exclude dormitory students whether legal residents or not— and certainly no authority supports excluding legal residents from the apportionment base. But the point is that the district court made insufficient factual findings for us to determine whether or not the illustrative plan could in fact be implemented, bearing in mind that the plan need not be in implementation-ready form when presented at trial. Insofar as the majority opinion is referring to the exclusion of dormitory students from an apportionment base generally, at least one district court in this circuit has implemented a similar approach in a VRA case, over a city's objections. See Boddie v. Cleveland, Mississippi, 297 F.Supp.2d 901 (N.D.Miss.2004).

. In so doing, I also take issue with the majority opinion's comment that “Any plan that splits USM into multiple wards, furthermore, would be highly suspect on its face.” Maj. op. at 670. The majority opinion cites to Sensley v. Albritton, 385 F.3d 591, 598 (5th Cir.2004) for this proposition. The court in Sensley, however, merely noted that it was not clear error for a district court to reject a plaintiff's proposed redistricting plan where it, among other problems, both combined disparate communities and split an existing community. This does not lead to any such affirmative rule as the one the majority opinion pronounces, particularly since, if USM were indeed made up mostly of nonresident students who could not vote, it would not be the kind of traditional community-in-interest that voting districting lines are required to take into account.

. While, as the majority opinion notes, Burns v. Richardson, 384 U.S. 73, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966), expressed concern about the potential for manipulation of voter registration statistics due to incentives for registration, the same opinion also noted that Hawaii, the state at issue in the case, had chosen to use registered voter numbers for its apportionment calculations because of the presence of a large number of nonresident military members and tourists who distorted the total population numbers. Burns, 384 U.S. at 94-95, 86 S.Ct. 1286. Further, Burns, like the Fifth Circuit case cited by the majority to similar effect, Marshall v. Edwards, 582 F.2d 927, 937 (5th Cir.1978), concerned challenges brought under the one person, one vote Equal Protection Clause framework, not the Voting Rights Act. While courts do not always distinguish between these two frameworks in discussing apportionment decisions, the legal considerations at stake are different, and may even conflict. See, e.g., Clarke & Reagan, Redistricting Litigation: An Overview of Legal, Statistical, and Case-Management Issues I.D.1. (discussing "a tension between section 2 of the VRA and the Fourteenth Amendment” insofar as "the remedy for vote dilution ... is for the state to redraw district lines ... making race a substantial factor” while "the Equal Protection Clause ... prohibits states from making race the predominant factor in drawing district boundaries.”). A survey of this law and an analysis of the different frameworks is not necessary here; I mean only to note that discussions of apportionment bases in Equal Protection cases may not always be applicable to Voting Rights Act cases and vice versa, and, as the Supreme Court has made clear, the details of individual cases and claims are what matter most, not an allegiance to a certain set of figures in the Voting Rights Act context.